No. 79,007

WATER DISTRICT NO. 1 OF JOHNSON COUNTY, *Appellee,* v.
MISSION HILLS COUNTRY CLUB, *Appellant.*
(960 P.2d 239)

Opinion filed June 5, 1998.

*Robert F. Bennett,* of Lathrop & Gage, L.C., of Overland Park, argued the cause, and *James G. Flaherty,* of Anderson, Byrd, Richeson & Flaherty, of Ottawa, was with him on the briefs for appellant.

*Wilson E. Speer,* of Speer, Austin, Holliday & Zimmerman, of Olathe, argued the cause, and *Michael J. Armstrong,* of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This case probes the interplay between a water district's claim of exclusive control of piped treated water service within its boundaries and a water user's dual counter contentions of no exclusivity and a violation of the Commerce Clause, U.S. Const., art. 1, § 8, cl. 3. Defendant Mission Hills Country Club (Club) appeals from summary judgment in a declaratory judgment action filed by plaintiff Water District No. 1 (District). The trial court enjoined the Club from buying water from the Kansas City, Missouri, water

department and piping the water under State Line Road to water the Club's golf course in Kansas. Finding no error in the reasoning of the trial court, we affirm.

Our jurisdiction is under K.S.A. 20-3018(a) (transfer to this court from the Court of Appeals).

The first issue is whether the Kansas Water District Act, K.S.A. 19-3501 *et seq.*, (the Act) grants the District an exclusive right to provide pressurized treated water by pipeline within its district boundaries. Our "yes" answer prompts an additional inquiry. Because the right is exclusive to the District, does the Act violate the Commerce Clause? We find no Commerce Clause violation.

## FACTS

The plaintiff District is a quasi-municipal corporation, established in the early 1950s to provide treated water to rapidly growing areas in and around Johnson County. The Act provided for the establishment of new, and the acquisition of existing, water distribution systems within the District's boundaries.

The Club, a Missouri corporation organized as a private social and golf club, is located within the boundaries of the District. The Club's golf course is located on the eastern edge of the District's boundary and next to the western boundary of Kansas City, Missouri. The Club and its golf course were originally within the franchise service area of the former Kansas Water Company (KWC). The KWC was a privately owned water utility that obtained its water supply from Kansas City, Missouri. In 1990, the area formerly served by the KWC was voluntarily annexed by the District under K.S.A. 19-3512. When KWC's service area was annexed, the Club became a District inhabitant. The Club has consistently purchased large volumes of water, at high rates of flow, from the District for irrigation purposes.

After the annexation, and in reliance on the consumption history and anticipated future demand within the KWC service area, the District invested in substantial capital improvements. The District wished to enhance its water supply facilities and distribution mains to accommodate future demand, which is affected by the large maximum day and maximum hour flow requirements of the Club.

The District made these improvements in conformance with recommendations made in a 1991 hydraulic study completed by an engineering firm.

In 1994, the District developed a new rate structure to encourage reduction of peak or summer consumption of water services. The objective was to more nearly equalize the demands for water services over the year on plant and facilities and reduce the need for future expenditures for a new plant and increased facility capacity. The new rate structure resulted in a large increase in the Club's water bill.

The Club has neither challenged the rate structure nor complained about the quality of service it received. In 1994, the Club began investigating ways to reduce irrigation costs. After deciding that use of effluent waste water would not result in savings, the Club entered into a lower priced purchase agreement with the water department of Kansas City, Missouri.

By constructing a private pipeline under State Line Road, the Club would be able to pipe pressurized treated water from Kansas City, Missouri, to water its greens and fairways. The water purchase agreement contemplates a water meter on the Missouri side of State Line Road. When the Club notified the District of the agreement, the District objected.

The District's elected board adopted the following rule:

"Pursuant to Water District law, K.S.A. 19-3501 *et seq.*, the Water District has the exclusive right and duty to serve, supply and service all users of treated water within its boundaries, and therefore no treated water shall be provided through any type of water supply or distribution pipe, conduit or other system, regardless of the point of supply, for use within the District's boundaries by any other water utility or other source of supply unless otherwise authorized by these Rules or by contract with the Water District."

Representatives of the Club's board attended the hearing on adoption of the exclusivity rule. The Club informed the District of the Club's intent to disregard the rule. Eventually, the District filed this action seeking to enjoin the Club from obtaining water from any source other than the District. The District was concerned that customers located on or near its boundaries would contract with adjoining water utilities to purchase water to the detriment of the

District. (Six other water districts are adjacent to the District on the north, west and south.) The District believed that unless it was the exclusive supplier of treated water to citizens living within its boundaries it would be subject to "ruinous competition."

## The Trial Court's Ruling

The lower court granted summary judgment in favor of the District, ruling that the Club could purchase water in Missouri and use the water in Kansas, if it did not use a pipeline to transport the water from Missouri. The trial court reasoned that the Kansas Legislature intended the District to be the exclusive public water utility within its boundaries and to be the only provider of treated water to inhabitants within its boundaries. In reaching the decision, the trial judge said:

> "I believe it's clear from the history of the act that the water district was established for the good of the citizens living within those boundaries or citizens the majority of whom requested that the water district expand into their area; therefore, under the facts and law of this case, judgment is granted in favor of plaintiff . . . ."

The trial judge observed: "Clearly, the legislature did not intend to prohibit individuals from using water by the customer's own means, such as wells on the customer's own property, obtaining water from grocery stores, things like that that were suggested within the memoranda of the parties." On the Club's assertion of a Commerce Clause violation, the trial judge said:

> "With regard to the Commerce Clause issue, again, I — although did not explicitly address that — I did implicitly address that. I do not believe that the Commerce Clause is applicable to this case . . . . [M]y decision did not prohibit anyone from going outside the state or anywhere else for that matter and obtaining water and bringing it into the Water District's boundaries so long as that was not done in the way sought by Mission Hills under these particular set of facts. My injunction goes purely to the way that Mission Hills was seeking to do it in this case which is via pipeline. If that was sought by truck, I don't think there's any problem with that—car, whatever method.
>
> ". . . Although I'm considering that Commerce Clause matter, I don't think we even get to that because I don't think it has any more than an incidental effect. And I don't frankly think that it has any effect, even incidental, on interstate commerce."

## DISCUSSION

We commence our analysis by inquiring: Does the Act grant the District an exclusive right to provide treated pressurized water by pipeline within its boundaries? What exclusivity, if any, did the legislature intend to grant to the District?

The trial court resolved the statutory interpretation question in favor of the District by granting summary judgment. Our standard of review applicable to summary judgment is well known. See *Calwell v. Hassan*, 260 Kan. 769, 777, 925 P.2d 422 (1996). The interpretation of a statute is a question of law. We have unlimited review of questions of law. *Davey v. Hedden*, 260 Kan. 413, 419, 920 P.2d 420 (1996).

### The Parties' Contentions on Exclusivity

The Club advances the premise that a public utility or quasi-municipal corporation can only exercise the powers granted to it by statute, citing *Water District No. 1 v. Robb*, 182 Kan. 1, 14, 318 P.2d 387 (1957), and *Wiggins v. Housing Authority of Kansas City*, 22 Kan. App. 2d 367, 369, 916 P.2d 718 (1996). The District does not assert a contrary rule. All concede that the Act never explicitly says that the District has an exclusive right to provide water by pipeline within its boundaries. The Club contends that the omission shows that the legislature did not intend to grant an exclusive service area to the District. The Club also argues that not only is there no express grant of an exclusive service area, but the Act does not imply an exclusive service area. However, the Club conceded in its submission to the trial court that the District had the right to exclude other water utilities from operating a "water supply and distribution system" within the District's boundaries. The Club points out that K.S.A. 19-3509 provides for a water district's board to have "exclusive control of the water supply and distribution facilities." The Club reasons that "the" in this phrase refers to supply and distribution facilities belonging to the District, not to water pipelines owned by inhabitants of the District. Therefore, the Club contends, K.S.A. 19-3509 does not prohibit inhabitants from installing their own pipeline to obtain water.

The District counters that the K.S.A. 19-3509 language means "any water supply and distribution facilities," and, therefore, the District has the right to control a pipeline such as the Club's proposed connection to the Missouri meter. The District contends its "right to control" position is strengthened when considered in conjunction with K.S.A. 19-3517. K.S.A. 19-3517 sets out the procedure for purchase or acquisition of existing water supply and distribution systems. The Club responds that K.S.A. 19-3517 is discretionary only; the water District is not required to acquire water supply and distribution systems within its territory. We observe, however, that the discretionary power to choose is a significant power.

The District argues that there is an implied legislative grant of an exclusive service area. *Wiggins,* relied on by the Club to support its "no specific grant" argument, acknowledges that powers are "necessarily implied" as well as specifically granted. 22 Kan. App. 2d at 369. (*Wiggins* took the "necessarily implied" phrase from a school district case, *Wichita Public Schools Employees Union v. Smith,* 194 Kan. 2, 4, 397 P.2d 357 [1964].)

The Club argues against exclusivity by emphasizing the recent trend toward increased competition among utility companies. The District, however, is a quasi-municipal corporation. Recent relaxation of competition among private utilities is not an apt analogy.

## Analysis of Exclusivity

Exclusivity in municipal services received judicial endorsement early on in Kansas. In *O'Neal v. Harrison,* 96 Kan. 339, 150 Pac. 551 (1915), this court upheld a Hutchinson ordinance that allowed the city to award an exclusive contract for garbage removal. The *O'Neal* court set a theme for resolution of this case by observing: "Monopolies, or any restraints on trade, are against public policy, but this is a rule of the common law and does not tie the hands of the legislature." 96 Kan. at 342.

Here the theme of exclusivity was orchestrated by the adoption of the Act. K.S.A. 19-3502 bars creation of new municipally owned and operated water supply and distribution systems in the District's territory after the District is formed. K.S.A. 19-3502 also provides

that the district created by the Act "shall be located in territory outside the limits of any territory served by or included within the limits of any previously organized municipally-owned and operated public water supply and distribution system." Before the District can serve a territory within the limits of a previously organized water supply and distribution system, it has to purchase or condemn the territory. See K.S.A. 19-3502; K.S.A. 19-3508; K.S.A. 19-3511; K.S.A. 19-3517; K.S.A. 19-3518.

We conclude that the legislature reasoned that a territory cannot be served by two water districts at the same time. The provisions of the Act must be construed together, that is, *in pari materia.* See *Todd v. Kelly,* 251 Kan. 512, 516, 837 P.2d 381 (1992). We note:

K.S.A. 19-3502 (the district will not cover area of previously established water utility and no new water utility may be established in water district's area);

K.S.A. 19-3509 (the district has exclusive control over the water supply and distribution facilities); and

K.S.A. 19-3517 (procedure for purchase or acquisition of existing water supply and distribution system).

The provisions of the Act, when read together, require the conclusion that the legislature intended the District to be granted an exclusive service area.

In *Water District No. 1 v. Robb,* 182 Kan. at 7, we summarized the public purpose for establishing the district that is the plaintiff here.

"There is no municipal water supply or distribution system, or any other public corporation or subdivision of the state located in the District which has any water supply or distribution facilities. All water service in the District, as well as sanitary sewer facilities, are furnished by the Kansas City Suburban Water Company, Inc., upon which the population of the District is entirely dependent. Because of the thickly populated nature of the District, it is in great need of fire protection and fire hydrants throughout substantially all its area because of the distribution of population over the area. At the present time this need has been reasonably provided for, no residence in the District being far removed from a fire hydrant.

"The water service furnished by the private water company in the past has at times proved inadequate for the needs of the Water District. Until the last year or so, there were frequent interruptions in service and a restricted supply of water which required rationing." 182 Kan. at 7.

Water is more than a convenience, it is essential to public health and for fire protection. Operation of a water supply and distribution system is a central function of local government.

Creation of a "district" necessarily involves drawing boundaries. The Act requires the county commission to find that "the boundaries of the territory are sufficiently described" before a hearing on a petition for creation of the water district can be set. K.S.A. 19-3503. When the water district annexes territory or extends its boundaries, K.S.A. 19-3512 requires that annexation resolutions and petitions be filed with the county clerk and the register of deeds of all counties in which a portion of the district lies. The existence of a "boundary" implies that there is a protected service area. If not, the purpose of describing specific boundaries and recording the descriptions with the county clerk and register of deeds would have little purpose.

Additional reasons beyond the statutory language of the Act weigh toward our exclusive service area conclusion. The Act names what it creates, a "water district." "District" means "a territorial division (as for administrative or electoral purposes)," and derives from Middle Latin *districtus*, meaning "jurisdiction, district." Webster's Ninth New Collegiate Dictionary 368 (1991).

2 McQuillin, Municipal Corporations § 7.08 (3d ed. 1996) says:

> "It is firmly established that there cannot be, at the same time, within the same territory, two distinct municipal corporations, exercising the same powers, jurisdiction, and privileges. The rule does not rest on any theory of constitutional limitation, but instead on the practical consideration that intolerable confusion instead of good government would obtain in a territory in which two municipal corporations of like kind and powers attempted to function coincidentally. . . . [M]unicipal corporations organized for different purposes may include the same territory."

Neither party has suggested the possibility of either a change of municipal boundary, or a request by the Club to be deannexed from the District. We note, however, that while K.S.A. 19-3504 (boundary extensions when 51% of the landowners petition for inclusion) and K.S.A. 19-3512 (mechanism whereby existing territories being served by adjoining water utilities may be annexed) provide for enlarging the boundaries of the District, there are no

corresponding provisions to allow deannexation from District boundaries. The absence of deannexation authority in the Act and the K.S.A. 19-3509 mandatory provision that the District shall provide water to its inhabitants support our exclusivity conclusion.

The only source of funding for the District is from current revenues and financing from revenue bonds. K.S.A. 19-3516. The District has no ability to issue general obligation bonds or to levy any taxes. The capital improvements built to serve the Club and other water users were financed by the District with the anticipation that those costs would be recovered through future revenues derived from user fees.

The Club intends to purchase water from another water utility (a "supply system") and transport treated water through a pipeline (a "distribution system") into the District's boundaries. The phrase "supply and distribution system" used throughout the Act supports the trial court's distinction that the Club may not use a "pipeline" to bring treated water into the District's boundaries.

K.S.A. 19-3509 provides in part:

"The water district board shall establish, manage, purchase, construct, operate, maintain and have the exclusive control of the water supply and distribution facilities and establish rules necessary for the safe, economical, efficient establishment, operation, maintenance and management of such water supply and distribution system."

We hold that the District has an exclusive right to provide treated pressurized water by pipeline within the District's boundaries. The Club is seeking a conditional deannexation. It wishes to continue to take advantage of District services for fire protection and domestic service, but "deannex" itself from the District for the purposes of irrigating its golf course; this it cannot do.

## The Club's Additional Contentions

The Club cites K.S.A. 66-104 and K.S.A. 66-131 in support of its contention that "the accepted rule in Kansas is that utility customers are not normally precluded from obtaining their own supply of heat, light or water for private use." K.S.A. 66-131 refers to K.S.A. 66-104. K.S.A. 66-104 does not support the Club's position because the private use exception applies to the first part of the

statute (telephone, telegraph, conveyance of oil and gas), but not the second part (heat, light, water, and power):

"The term *"public utility,"* as used in this act, shall be construed to mean every corporation, company, individual, association of persons, their trustees, lessees or receivers, that now or hereafter may own, control, operate or manage, except for private use, any equipment, plant or generating machinery, or any part thereof, for the transmission of telephone messages or for the transmission of telegraph messages in or through any part of the state, or the conveyance of oil and gas through pipelines in or through any part of the state, except pipelines less than 15 miles in length and not operated in connection with or for the general commercial supply of gas or oil, *and all companies for the production, transmission, delivery or furnishing of heat, light, water or power."* (Emphasis added). K.S.A. 66-104.

The Club relies on *State, ex rel., v. City of Coffeyville,* 138 Kan. 909, 28 P.2d 1032 (1934), for the proposition that a customer may bypass a natural gas utility. In *Coffeyville,* however, the customer was the City of Coffeyville. *Coffeyville* did not involve a challenge from a public utility that claimed exclusive rights to serve the city. Instead, the challenge questioned the city's changing its natural gas supplier by resolution instead of by ordinance. In deciding that a resolution was sufficient, we drew a distinction between a city's granting a "privilege to use streets and alleys in connection with some service to the inhabitants of the city" and the city's decision to "buy gas, just as it might buy coal." 138 Kan. at 912. *Coffeyville* is not an example of competition between natural gas utility companies in the same geographical area. The Club's use of *Coffeyville* is not on point.

The Club also relies on K.S.A. 12-2001, the successor to the statute involved in *Coffeyville.* K.S.A. 12-2001(b)(3) provides that if a city grants a franchise to furnish, among other things, water service, that franchise cannot be exclusive. K.S.A. 12-2001(b)(3) does not apply. Here, the District's exclusive franchise was granted by the legislature. The municipality involved here is the District itself, a "quasi-municipal body corporate with the power of eminent domain." K.S.A. 19-3502.

The Club argues that under K.S.A. 66-1,184, an electric utility customer can compete with the electric utility. Competition results from the customer's generating electricity and selling any surplus

to the utility company. K.S.A. 66-1,184 is limited to electric utilities.

The Club cites two Oklahoma cases, *Westville Utility Authority v. Bennett*, 903 P.2d 880 (Okla. App. 1995) and *Comanche Cty. R. Water Dist. No. 1 v. City of Lawton*, 501 P.2d 490 (Okla. 1972), as further support of its position that exclusive service areas are disfavored in the law.

*Westville* held that a town utility authority did not have the exclusive right to provide water for customers within the city limits. In so holding, the *Westville* court noted that the Oklahoma constitution prohibits municipalities from granting exclusive franchises. 903 P.2d at 882. The Kansas Constitution differs. See Kan. Const. Bill of Rights, § 2.

*Comanche County* turned on the same Oklahoma constitutional provision, and consequently is off the point for discussion here. See 501 P.2d at 492.

## The Commerce Clause

Having found exclusivity lies with the District, our inquiry does not end. The Club argues that if the Act grants exclusivity, the Commerce Clause, U.S. Const., art. I, § 8, cl. 3 is violated. We disagree. We agree with the trial court that the facts here do not present a Commerce Clause issue.

The District argues that the constitutional issue is not properly before us because the Club did not serve the Kansas Attorney General under K.S.A. 60-1712. We need not reach the K.S.A. 60-1712 contention because of our conclusion on the Commerce Clause issue.

The Commerce Clause has historically been interpreted "not only as an authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation." *Hughes v. Oklahoma*, 441 U.S. 322, 326, 60 L. Ed. 2d 250, 99 S. Ct. 1727 (1979). This restrictive aspect has been referred to as the "dormant" Commerce Clause. The dormant Commerce Clause prohibits states, unless authorized by Congress, from "attempting to advance their own commercial interests by curtailing the movement of articles of commerce, either into or

out of the state." *Hood & Sons v. Du Mond,* 336 U.S. 525, 535, 93 L. Ed. 865, 69 S. Ct. 657 (1949).

A law that impacts interstate commerce can survive dormant Commerce Clause scrutiny only by advancing a legitimate local purpose that cannot be adequately served by reasonable alternatives. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 25 L. Ed. 2d 174, 90 S. Ct. 844 (1970).

The Club relies on a solid waste case, *C & A Carbone, Inc. v. Clarkstown,* 511 U.S. 383, 128 L. Ed. 2d 399, 114 S. Ct. 1677 (1994), as support for its dormant Commerce Clause position. For a general overview of *Carbone's* effect on solid waste disposal, see Petersen and Abramowitz, *Municipal Solid Waste Flow Control in the Post-*Carbone *World,* 22 Fordham Urban L.J. 361 (1995). *Carbone* involved a so-called "flow control ordinance," which required all solid waste to be processed at a designated transfer station before leaving the municipality. The transfer station, while not exactly municipally owned, was "essentially a municipal facility, built and operated under a contract with the municipality and soon to revert entirely to municipal ownership." 511 U.S. at 419, (Souter, J., dissenting). The United States Supreme Court held that the ordinance violated the Commerce Clause because it required all in-county possessors of trash to use the transfer station. In-state and out-of-state processors were thereby deprived of waste processing and disposal business. The Court noted that such business, "not so much the solid waste itself," was the article of commerce involved. 511 U.S. at 391.

The plaintiff, C & A Carbone, Inc. (Carbone) operated a recycling center in Clarkstown and processed waste that originated in Clarkstown and outside New York state. Although Carbone already separated recyclables from collected solid waste at its own transfer station, it was required by the challenged ordinance to haul the already processed waste to the Clarkstown transfer station and pay for reprocessing. Carbone bypassed the Clarkstown station and disposed of the waste out-of-state. Clarkstown filed an action to enjoin Carbone from hauling waste out of state. Clarkstown financed its new transfer facility with the income generated by the waste flow. The town guaranteed a private company a minimum revenue from

waste flow which, if not met, would be made up for by a monetary payment by the town. The flow control ordinance permitted recyclers like Carbone to continue receiving solid waste, but it required them to bring the nonrecyclable residue from that waste to the transfer station.

The Clarkstown facility competed with other facilities that received solid waste, such as the landfills in Indiana, Illinois, West Virginia, and Florida that Carbone was caught patronizing. Clarkstown did not provide trash collection and disposal services from garbage can to landfill. It did not collect trash. Instead, it intervened in one phase of the trash collection and disposal process and attempted to force customers to consume its services to the exclusion of other providers of similar services. Because other providers could be (and in fact were) located out of state, the Supreme Court held that by requiring Carbone to send the nonrecyclable waste it processed to the Clarkstown facility, the ordinance "drives up the cost for out-of-state interests to dispose of their solid waste." 511 U.S. at 389. Also, the ordinance favored the local operator, thereby depriving "out-of-state business of access to a local market." 511 U.S. at 389.

*Carbone* is not applicable to the Club-District controversy. It is true that the inhabitants of the District are prohibited from buying treated piped water from another water district. The forbidden water district can be in state or out of state. The difference here is that the District itself performs the entire piped pressurized water production and delivery operation within its boundaries and, in doing so, it provides a municipal service.

After *Carbone*, the United States Court of Appeals for the Second Circuit, construing *Carbone* narrowly, upheld two municipal solid waste flow control systems by distinguishing them from *Carbone* on their facts. See *U.S.A. Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272 (2d Cir. 1995), *cert. denied* 517 U.S. 1135 (1996); *SSC Corp. v. Town of Smithtown*, 66 F.3d 502 (2d Cir. 1995), *cert. denied* 516 U.S. 1112, *reh. denied* 517 U.S. 1150 (1996); Roddewig and Sechen, *The Second Circuit Defines the Limits of Carbone*, 28 The Urban Lawyer 847 (1996). *U.S.A. Recycling* empha-

sized the municipal aspect of the system in finding no Commerce Clause violation.

In *U.S.A. Recycling,* the town of Babylon had elected to take over the local commercial garbage market. Babylon created a commercial garbage district. The town occupied the waste collection and disposal markets by licensing and hiring a private contractor to collect all garbage. Babylon refused to renew the licenses of any other private haulers. The contractor was allowed to dispose of town waste at no charge at a public incinerator operated by a private company. The commercial garbage collection and disposal system was financed by a flat benefit assessment to commercial property owners, plus a schedule of user fees to individual businesses.

The *U.S.A. Recycling* court divided its analysis into a review of (1) trash hauling and (2) trash disposal. The trash disposal aspect centered on the town's allowing the trash hauling contractor to dump trash for free at the incinerator. The trash disposal aspect of the case does not assist in our discussion because the court held that the town's decision to let the trash hauling contractor dump trash collected in the district for free at the incinerator constituted market participation. 66 F.3d at 1288.

The market participation exception to the dormant Commerce Clause applies when a municipality or state participates in a market. In such a situation, a state may favor its own citizens without violating the Commerce Clause. See *White v. Mass. Council of Constr. Employers,* 460 U.S. 204, 208, 75 L. Ed. 2d 1, 103 S. Ct. 1042 (1983); *Reeves, Inc. v. Stake,* 447 U.S. 429, 435-36, 65 L. Ed. 2d 244, 100 S. Ct. 2271 (1980); *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 810, 49 L. Ed. 2d 220, 96 S. Ct. 2488 (1976). Here, the District contends it is a market participant, not a market regulator, and thus is entitled to the exception. We note that the District is not merely favoring in-state buyers or disfavoring out-of-state sellers. Instead, it is requiring in-state interests to patronize it. The facts are therefore distinguishable from *White, Reeves,* and *Hughes.* Because we hold the Act is not subject to Commerce Clause scrutiny, however, we need not reach the District's market participant contention.

*U.S.A. Recycling*, in the second part of its analysis, held that Babylon was acting as a market regulator rather than a market participant, but nevertheless held that the town's actions did not violate the Commerce Clause.

The reasoning of *U.S.A. Recycling* in holding that the Commerce Clause was not violated is on point here. The town was forcing commercial residents to use the municipal collection system. *U.S.A. Recycling* found that Babylon had eliminated the garbage collection market entirely, and although that constituted market regulation rather than market participation, it did not discriminate "in any way against interstate commerce." 66 F.3d at 1283. Babylon did not favor in-state garbage haulers over out-of-state competitors, nor did it handicap other in-state and out-of-state businesses from competing against a group of local proprietors, because it was providing municipal services.

"No one enjoys a monopoly position selling garbage collection services in Babylon's commercial garbage market, because the Town has eliminated the market entirely. Not even the Town itself remains as a seller in the market. Although the Town is now the lone provider of garbage collection services in the District, it does so *as a local government providing services to those within its jurisdiction*, not as a business selling to a captive consumer base." (Emphasis added.) 66 F.3d at 1283.

The local government services concept distinguishes *U.S.A. Recycling* from *Carbone*. Noting that the flow control ordinances that are impermissible under *Carbone* require local garbage haulers to buy processing or disposal services from a local facility, the *U.S.A. Recycling* court said:

"In Babylon, local businesses do not buy services from anyone. Instead the Town unilaterally provides garbage services to everyone in the District. Although taxpayers in the District ultimately foot the bill for these garbage services—just as they foot the bill for street sweeping, street lighting, sewage treatment, public schools, and police and fire protection, to name just a few other basic services provided by local governments—the payment of taxes in return for municipal services is not comparable to a forced business transaction." 66 F.3d at 1283.

We apply the reasoning in *U.S.A. Recycling* here. The State of Kansas has replaced the piped pressurized water market in Johnson County with the District. The District itself is a quasi-municipal

corporate body. See K.S.A. 19-3502. Legislative replacement does not discriminate against interstate commerce. In creating the District, Kansas has not favored in-state piped water producers over out-of-state competitors. Nor has the State handicapped other in-state and out-of-state businesses from competing against a group of local proprietors. No one enjoys a monopoly position selling piped water in Johnson County's commercial piped water market because the State has eliminated the market entirely. Not even the District remains as a seller in the market. Although the District is now the lone provider of piped water in the district, it does so as a local government providing services, not as a business selling to a captive consumer base. The District unilaterally provides service to everyone in the district. Through user fees, inhabitants of the District pay the bill for piped water. The District is fulfilling a governmental duty, required by statute, to meet the demand for piped water. K.S.A. 19-3509.

There are problems with allowing a water district patron to elect to be served by another water district. Water is vital to human survival. The provision of clean treated water is an essential service to populated areas. The creation of a water supply and distribution system involves a tremendous public investment. It is a fixed system, with each pipe connecting eventually to the source of the water at the water treatment plant. For customers to be served by two water districts, there would have to be two distinct systems of pipe duplicated geographically to the extent that the districts overlapped. A switching system is improbable. A water distribution system is different from a trash hauling system, where public roads are used. The trash, loaded on competing companies' trucks, may traverse the same lines of transit and may even be in transit at the same time. Here, the District provides a municipal service within its boundaries. The Club is therefore trying to purchase a municipal service outside the district, indeed out of state.

Additional language from *U.S.A. Recycling* is pertinent in distinguishing *Carbone* from the facts here. "We have already rejected the notion that the Town's provision of exclusive sanitation services places any burdens on interstate commerce, since the Town pro-

hibits *all* garbage haulers from contracting with local businesses." 66 F.3d at 1287.

"This case boils down to two simple propositions. First, towns can assume exclusive responsibility for the collection and disposal of local garbage. Second, towns can hire private contractors to provide municipal services to residents. In neither case does a town discriminate against, or impose any burden on, interstate commerce. The local interests that are served by consolidating garbage service in the hands of the town—safety, sanitation, reliable garbage service, cheaper service to residents—would in any event outweigh any arguable burdens placed on interstate commerce." 66 F.3d at 1295.

The District, as a quasi-municipal corporation, is providing a governmental service; thus, there is not any "commerce" to call the Commerce Clause into play. The services due a citizen ("inhabitant" under the Act) from the District, mandated by the legislature and rendered within the boundaries of the District, are not items of commerce.

Affirmed.

MCFARLAND, C.J., and LARSON, J., not participating.

ROBERT H. MILLER, C. J. Retired, and ROBERT J. LEWIS, JR., J., assigned.