No. 101,811

MIAMI COUNTY BOARD OF COMMISSIONERS, *Appellee,* v. KANZA
RAIL-TRAILS CONSERVANCY, INC., *et al.,* *Appellants.*

(255 P.3d 1186)

Opinion filed June 10, 2011.

*Michael T. Mills*, of Michael T. Mills, Chartered, of McPherson, argued the cause and was on the briefs for appellant.

*David R. Heger*, county counselor, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: This appeal relates to 4.5 miles of a railroad right-of-way in Miami County, Kansas, that has been railbanked and is now operated as a recreational trail. Generally, the issues in this appeal focus on the relationship between and the application of the Kansas Recreational Trails Act (KRTA), K.S.A. 58-3211 *et seq.*, and the National Trails System Act, commonly referred to as the

federal Rails to Trails Act (Trails Act), 16 U.S.C. § 1241 *et seq.* (2010). Specifically, this appeal raises the issues of:

  (1) Whether 16 U.S.C. § 1247(d) (2010) of the Trails Act preempts the KRTA and, particularly,

    (a) Whether the KRTA is preempted because it impermissibly conflicts with 16 U.S.C. § 1247(d) of the Trails Act;

    (b) Whether the KRTA is preempted because it violates the Commerce Clause of the United States Constitution by impermissibly discriminating between types of recreational trails;

  (2) Whether the KRTA violates equal protection rights by establishing statutory requirements for recreational trails created by interim use of railroad rights-of-way; and

  (3) Whether the district court has jurisdiction to set the amount of bond required under the KRTA when the parties disagree as to the amount.

The district court, in addressing the original action for a writ of mandamus, concluded the KRTA was not preempted by 16 U.S.C. § 1247(d) of the Trails Act, was not in conflict with the Trails Act, and did not violate any constitutional rights. Additionally, the district court determined that Miami County had the authority to require a bond, and the court required Kanza Rail-Trails Conservancy, Inc. (Kanza) to pay a bond of $9,040.

Kanza appealed, and the matter was transferred to this court pursuant to K.S.A. 20-3018(c). We affirm.

## FEDERAL AND STATE STATUTES

The federal statute at issue was adopted in 1976 when Congress passed the original version of the Trails Act, which was aimed at promoting the conversion of abandoned rail lines to recreational trails. *Preseault v. ICC*, 494 U.S. 1, 6-7, 110 S. Ct. 914, 108 L. Ed. 2d 1 (1990). Pursuant to its authority to regulate interstate commerce, Congress granted the Interstate Commerce Commission (ICC), and later the Surface Transportation Board (STB), exclusive authority over the construction, operation, and abandonment of the nation's rail lines. In light of that authority, when a railroad operator wants to cease operations on a rail line, it must file a notice

of its intent with the STB, which can authorize the abandonment only if it finds that public convenience and necessity require it. 49 U.S.C. § 10903(d) (2006). In this process, as provided by amendments to the Trails Act adopted by Congress in 1995, the STB has the authority to preserve rights-of-way not currently in service for possible future railroad use (called "railbanking") and to allow interim use of the land as recreational trails. *Preseault*, 494 U.S. at 6-7.

To facilitate this interim use of a railroad right-of-way, the Trails Act provides that a railroad wishing to cease operations along a particular route may negotiate with a state, municipality, or private group that is prepared to assume financial and management responsibility for the right-of-way. Specifically, pursuant to the 1995 amendments, 16 U.S.C. § 1247(d) of the Trails Act provides in part:

"If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Board shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use."

If no agreement is reached, the railroad may be permitted to abandon the line entirely. *Preseault*, 494 U.S. at 6-8.

In addition to these federal provisions relating to the interim use of a rail line as a recreational trail, the Kansas Legislature adopted the KRTA, which relates to the development and use of any property that is transferred or conveyed for interim use. Under the KRTA, "[u]pon receipt of permission from the appropriate federal agency to enter into negotiations for interim trail use, the responsible party shall give written notice to each adjacent property owner that the responsible party intends to build a recreational trail adjacent to the property owner's property." K.S.A. 58-3213(a). Also, the responsible party must prepare a plan for development of the recreational trail and submit that plan to the commission of all counties or governing body of all cities through which the trail will pass. K.S.A. 58-3213(b)(3), (4). Two of the terms in these require-

ments are statutorily defined: K.S.A. 58-3211(b) defines a "[r]ecreational trail" as "a trail created pursuant to subsection (d) of 16 U.S.C. [§] 1247 (1983)" of the Trails Act, and K.S.A. 58-3211(c) defines a "[r]esponsible party" as "any person, for-profit entity, not-for-profit entity or governmental entity that is responsible for developing, operating or maintaining a recreational trail."

K.S.A. 58-3212 of the KRTA imposes several duties on the responsible party, including: providing for safety, use, and accessibility of the recreational trail; providing for litter control; providing for education of trail users and signage regarding safety, trespassing, and litter control; maintaining the trail so it does not create a fire hazard; providing trash receptacles and cleanup of trash and litter; prohibiting the use of motorized vehicles other than wheelchairs and maintenance, law enforcement, and emergency vehicles; prohibiting hunting or trapping along the trail; providing law enforcement along the trail; maintaining and installing fencing between the trail and adjoining property; and maintaining the trail, bridges, culverts, roadway intersections, crossings, and signs on the trail. K.S.A. 58-3212(a).

To protect the city or county from damage if a nongovernmental responsible party does not fulfill these obligations, K.S.A. 58-3212(b) provides that the nongovernmental responsible party "shall file" with the county clerk of each county "where a portion of the recreational trail is or will be located a bond or proof of an escrow account in a Kansas financial institution, as defined by K.S.A. 16-117[,]" payable to the county. The statute specifies that "[t]he bond or escrow account shall be conditioned on the responsible party's performance, and shall be in an amount agreed upon between the responsible party and the county commission as sufficient to fully cover" the annual enumerated costs. K.S.A. 58-3212(b).

The dispute in this case arose over the application of these statutes to the proposed development of a recreational trail in Miami County, Kansas.

## FACTS AND PROCEDURAL BACKGROUND

The factual background begins when the Missouri Pacific Rail-

road Company (Missouri Pacific) sought to abandon a portion of the railroad right-of-way between milepost 335.5 near Osawatomie and milepost 388.25 near Osage City. On January 30, 1995, Missouri Pacific was authorized by the STB to negotiate an interim use/railbanking agreement with the Rails-to-Trails Conservancy (RTC) for the right-of-way pursuant to the Trails Act. Nearly a year later, Missouri Pacific notified the STB that this rail line plus some additional line (collectively known as the Hoisington Subdivision) had been conveyed to the RTC through a donative quitclaim deed in accordance with the Trails Act, effective December 1995.

Pursuant to a May 1996 request by the RTC and Seranata Farms School of Equestrian Arts (Seranata), a nonprofit corporation, Seranata agreed to assume full responsibility for management of the Missouri Pacific right-of-way, and the RTC deeded the abandoned corridor to Seranata. As a result, the STB reopened the matter, vacated the previous Certificate of Interim Trail Use, which had been issued to the RTC, and issued a replacement certificate to Seranata.

In 1997, the same process was followed when Seranata deeded its interest in the right-of-way to the Kansas Horseman Foundation, Inc., another nonprofit corporation, and the STB authorized the Kansas Horseman Foundation to be the new trail user. Subsequently, the Kansas Horseman Foundation changed its name to Kanza Rail-Trails Conservancy, Inc., which is its current name. Under the Trails Act, therefore, Kanza is the current responsible party for the Missouri Pacific right-of-way, which runs through several counties, including Miami County where there is 4.5 miles of trail.

Before 2005, the Miami County Board of Commissioners (Miami County) had limited contact with Kanza and its predecessors. Nevertheless, over the years, disagreements arose concerning Kanza's obligations under Kansas law and the authority of Miami County to enforce those obligations. Kanza began working on a recreational trail in November 2005 without any discussions with or notice to Miami County. From November 2005 through July 2008, Kanza developed the recreational trail, providing maintenance and signage as it deemed appropriate, controlling noxious

weeds under the guidance of the Miami County Noxious Weeds Compliance Officer, and removing some litter from the trail. Because these activities were ongoing, by the time the district court issued its journal entry of judgment in 2008, the recreational trail development was nearing completion.

Meanwhile, on December 5, 2005, Miami County took informal action by requesting representatives of Kanza to meet with Miami County Administrator Shane Krull to resolve differences and to discuss the KRTA regulations for usage of the right-of-way as a recreational trail. Miami County also requested that the county administrator establish the amount for a bond to be posted or an escrow account to be established by Kanza.

Communications between the county administrator and Kanza were not productive. Krull, on behalf of Miami County, determined that the KRTA required Kanza to provide certain specific maintenance of the recreational trail—such as center post bollards to deter motor vehicles from using the trail, noxious weed control, signs, litter control, and fences. Krull calculated the amount of bond or escrow account on the estimated cost of those features. By letter on December 14, 2005, Miami County notified Kanza, in part, that the county would request a bond in the amount of $73,620 to comply with the requirements of the KRTA and that Kanza should cease work on the recreational trail. The estimate was broken down as follows: "Weed Control, $4,680.00; Litter Control $1,745.00; Trail Maintenance $1,200.00; Fencing $63,360.00; and Signage $2,635.00." The letter further provided that the "bond could be reduced in future years as the permanent improvements, *i.e.*, fencings, signs, etc., are installed and only require periodic maintenance." Kanza objected.

When no agreement was reached by the parties, Miami County filed a petition for writ of mandamus with the district court. Kanza filed a timely answer to Miami County's petition, but it also filed a motion to dismiss based on the contention that the Trails Act preempts the KRTA. After holding a hearing at which the parties presented their arguments, the district court denied Kanza's motion to dismiss, finding that the KRTA is not preempted by federal

law. The court stated that if it were to hold that the Trails Act preempts the KRTA,

"[s]uch a ruling would vitiate the Kansas Act without regard to the manner in which it might be implemented. The Court is not prepared to take such action. Not only does the Court find ample room for the co-existence of a well-employed KRTA and the [Trails Act], numerous examples in Kansas and elsewhere demonstrate that the [Trails Act] needs state/local regulatory involvement to accomplish the purposes of the Federal Act. However, the Court is mindful that the manner in which the KRTA is implemented may be inconsistent with the [Trails Act]. Whether the Plaintiff's position in implementing the KRTA is arbitrary or in conflict with the [Trails Act] shall be the focus of future proceedings in this action."

The district court also ordered the parties to participate in mediation for resolving the amount of the bond or escrow account required to cover the expenses of Kanza's trail management duties. When mediation proved unsuccessful, the district court held a status conference and set the case for trial. The court reiterated that it had previously determined that the Trails Act does not preempt the KRTA and that "the remainder of the case is to determine whether the Plaintiff's implementation of the [KRTA] is arbitrary or in conflict with the [Trails] Act."

After a brief bench trial, the district court granted Miami County's petition for writ of mandamus. In making findings, the district court examined the evidence relating to each statutory duty and made extensive findings regarding the tasks that Kanza had completed, the tasks that needed to be performed and the costs relating to each, and the costs of ongoing obligations. The district court rejected Miami County's arguments on some duties, including a suggestion that Kanza should erect center post bollards. The district court also ruled that the KRTA controlled the type of fencing that must be installed and general Kansas fence laws, specifically K.S.A. 29-101 (requiring enclosure of domestic animals with fence), did not apply. In a related matter, the district court made findings regarding the parties' differing views on the need and cost of fencing between the trail and the adjoining property of two landowners. In light of the evidence regarding the cost of fulfilling

the various responsibilities, the district court discussed the statutory requirement for a bond or escrow account:

"Plaintiff's trial position is that pursuant to the KRTA, [Kanza] should file a bond/escrow account in the range from $10,440 to $13,590, which bond/escrow account will cover the annual obligations for responsible parties specified in K.S.A. 58-3212(b). While Plaintiff's Exhibit 9 details its bond/escrow account computations, the following general summary is instructive:

| | |
|---|---|
| "Weed Control | $2,340 |
| "Fences and Gates | $5,600 to $7,600 |
| "Trailhead Improvement (including litter control) | $2,500 to $3,650." |

The district court then discussed the evidence regarding these expenses and concluded the following costs were reasonable: $2,340 for annual control of noxious weeds, $1,400 for installation of litter receptacles and the annual cost of litter control, $5,200 for installing fencing, and $1,500 for installing signs. Consequently, the district court ordered Kanza to file with the County Clerk of Miami County a bond or proof of an escrow account in a Kansas financial institution, as defined in K.S.A. 16-117, payable to Miami County in the amount of $9,040.

Additional facts and findings will be discussed further as necessary in the analysis.

### ISSUE 1. FEDERAL PREEMPTION

First, Kanza argues that the district court erred in finding that the Trails Act, specifically 16 U.S.C. § 1247(d), does not preempt K.S.A. 58-3212 of the KRTA. Kanza takes two approaches to this argument. In one approach, Kanza argues that the KRTA is preempted because the federal government has traditionally regulated railroad rights-of-way and because the KRTA impermissibly conflicts with the Trails Act. In the other approach, which is an argument stated in the alternative, Kanza argues that the KRTA is preempted because it impermissibly discriminates against interim recreational trails in railbanked rights-of-way (rail-trails). In making this argument, Kanza melds a Supremacy Clause (Article VI, paragraph 2 of the United States Constitution) argument with an argument that the KRTA violates the Commerce Clause (Article I, section 8, clause 3 of the United States Constitution) because it

places requirements on rail-trails but does not place such requirements on any other category of recreational trail.

Neither of Kanza's approaches is persuasive.

A. *Standard of Review/Preemption Doctrine Generally*

Preemption is a question of law over which this court exercises de novo review. *Zimmerman v. Board of Wabaunsee County Comm'rs*, 289 Kan. 926, 974, 218 P.3d 400 (2009); *Steffes v. City of Lawrence*, 284 Kan. 380, 385, 160 P.3d 843 (2007).

The doctrine of federal preemption is founded in the Supremacy Clause of the United States Constitution:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof, . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, paragraph 2.

Simply put, the Supremacy Clause invalidates state laws that interfere with, or are contrary to, federal law. Application of this well-recognized interpretation of the Supremacy Clause has led to recognition that federal law may supersede state law in several different ways, and in turn this recognition has led to the use of several analytical categories. See *Doty v. Frontier Communications, Inc.*, 272 Kan. 880, 889, 36 P.3d 250 (2001).

Broadly speaking, a preemption analysis divides into two principal categories: express and implied preemption. Implied preemption is further divided into two analytical subcategories: field preemption and conflict preemption. Then, yet a third strata of analytical subcategories is used when examining claims of conflict preemption: per se conflict and obstacle preemption. *English v. General Electric Co.*, 496 U.S. 72, 79, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990); *Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 713, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985); see *Geier v. American Honda Motor Co.*, 529 U.S. 861, 884, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (2000) (referring to both field and conflict categories as implied preemption); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S. Ct. 1483, 131 L. Ed. 2d 385 (1995) (same). Even though it is analytically helpful to consider the relationship of these categories, it must be remembered that these

analytical categories are not "rigidly distinct." *English*, 496 U.S. at 79 n.5. For example, "field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a preempted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation." *English*, 496 U.S. at 79 n.5.

In this case, both parties cite to our decision in *Doty*, in which we enumerated and summarized the categories of implied preemption, noting the doctrine applied to situations

"[1] where there is an actual conflict between federal and state law; [2] where compliance with both federal and state law is, in effect, physically impossible; [3] where Congress has occupied the entire field of regulation and leaves no room for states to supplement federal law; or [4] when the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress." *Doty*, 272 Kan. 880, Syl. ¶ 4.

With this analytical framework in mind, we will consider Kanza's preemption arguments.

## B. *Scope of Federal Regulation of Railbanked Rights-of-Way*

### 1. *Express Preemption*

The first of the two principal categories—express preemption—applies when Congress makes its intent known through explicit statutory language. *English*, 496 U.S. at 79. Kanza admits that Congress did not make an express statement of preemption with respect to the management responsibilities for a rail-trail when it enacted the Trails Act, specifically 16 U.S.C. § 1247(d). As we will more fully discuss, there are areas related to railroads and the possession and use of railroad rights-of-way where Congress expressly preempts state law. See 49 U.S.C. § 11501(b) (2010); *Rasmuson v. United States*, 91 Fed. Cl. 204, 206 (2010). Nevertheless, these express statements that preempt state law do not address the type of health and safety regulations regarding development and use of trails that are at issue in this case.

### 2. *Implied Preemption*

Even so, the federal provisions that expressly preempt state regulation play a role in our analysis of the second principal category—

implied preemption. Implied preemption occurs when Congress does not expressly preempt state law, but its intent to do so can be inferred from a statutory or regulatory scheme. *English,* 496 U.S. at 79. Kanza suggests an intent to preempt state law can be inferred because of the pervasive nature of federal regulation of railroads and railbeds, *i.e.,* field preemption, and because of its intent to prohibit any state or local law that would conflict with the objectives of the Trails Acts, *i.e.,* conflict preemption. Kanza focused on conflict preemption in its initial brief filed with this court but expanded its argument to include field preemption in its reply to Miami County's suggestion that we should presume that Congress did not intend to preempt the KRTA. Because of the potential role this presumption has in our analysis, we will first discuss the presumption and the field preemption arguments that relate to its application.

a. *Field Preemption and Presumption*

The presumption is often noted in this court's cases dealing with preemption. Simply stated, " '[i]n the absence of express preemption in a federal law, there is a strong presumption that Congress did not intend to displace state law.' [Citation omitted.]" *Zimmerman,* 289 Kan. at 975. However, the presumption does not apply if the area of regulation is one where the interests at stake are "uniquely federal" in nature. *Boyle v. United Technologies Corp.,* 487 U.S. 500, 504, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988); see *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 347, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001) (The Court declined to apply the presumption because "[p]olicing fraud against federal agencies is hardly 'a field which the States have traditionally occupied.' . . . To the contrary, the relationship between a federal agency and the entity it regulates is inherently federal in character . . . ."); *United States v. Locke,* 529 U.S. 89, 108, 120 S. Ct. 1135, 146 L. Ed. 2d 69 (2000) (holding presumption applies " 'in [fields] which the States have traditionally occupied,' " but declining to apply it because "national and international maritime commerce" is not such a field).

Kanza argues preemption occurs because we are dealing with a field traditionally occupied by the federal government—railroads and railroad rights-of-way—and Miami County argues we are dealing with an area typically occupied by the states—historic police powers. These arguments are closely related to the first of the two types of implied preemption, known as field preemption. Field preemption applies when "Congress' intent to pre-empt all state law in a particular area may be inferred [because] the scheme of federal regulation is sufficiently comprehensive" or " 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " *Hillsborough County*, 471 U.S. at 713 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 [1947]).

In sorting out the parties' opposing viewpoints, we recognize that, without question, Congress has regulated some aspects of railbanking. The historical roots of this regulation begin with the federal regulation of railroads, which is both pervasive and comprehensive. See, *e.g.*, *Chicago & N.W. Tr. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318, 101 S. Ct. 1124, 67 L. Ed. 2d 258 (1981). Numerous court decisions recognize that Congress has exercised preemptive, if not exclusive, power to regulate the railroads. See, *e.g.*, *Norfolk & Western R. Co. v. Train Dispatchers*, 499 U.S. 117, 128, 111 S. Ct. 1156, 113 L. Ed. 2d 95 (1991) (Congress' intent to exempt railroads from antitrust laws and all other laws, including state and municipal laws, was "clear, broad and unqualified"); *Chicago & N.W. Tr. Co.*, 450 U.S. at 320 (ICC's [now STB's] abandonment authority is "plenary" and "exclusive"); *Missouri Pacific R.R. Co. v. Stroud*, 267 U.S. 404, 408, 45 S. Ct. 243, 69 L. Ed. 683 (1925) (Congress' acts concerning interstate commerce are "supreme and exclusive").

In addition, through other legislation, Congress has exercised federal authority over railroad rights-of-way when possessed for railway purposes. For example, the STB preemption statute provides that the STB's jurisdiction over "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities . . . is exclusive." 49

U.S.C. § 10501(b) (2010). This provision continues with an express statement of preemption: "[T]he remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b).

As this statutory provision indicates, the federal government exclusively regulates the abandonment or discontinuance of a railroad right-of-way, and railbanking is clearly a part of that regulatory process. As the United States Supreme Court found, when Congress amended the Trails Act again in 1983, it sought to " 'preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use.' [Citations omitted.]" *Preseault v. ICC*, 494 U.S. 1, 18, 110 S. Ct. 914, 108 L. Ed. 2d 1 (1990). Further, under the plain language of 16 U.S.C. § 1247(d), the subject provision in this case, it is clear that railbanked rights-of-way remain part of the national rail transportation system subject to the jurisdiction of the STB. In other words, the STB retains jurisdiction for future railroad use. See *Preseault*, 494 U.S. at 5 n.3; *Good v. Skagit County*, 104 Wash. App. 670, 675-76, 17 P.3d 1216, *rev. denied* 144 Wash. 2d 1013 (2001).

But it must be emphasized that the STB's role in a railbanking proceeding is "largely ministerial." *Goos v. I.C.C.*, 911 F.2d 1283, 1296 (8th Cir. 1990). This is obvious in that Congress has determined that *every* inactive railroad right-of-way is appropriate for recreational trail use. Under 16 U.S.C. § 1247(d) and 49 C.F.R. § 1152.29(a)(2) (2009), the STB must issue a Notice of Interim Trail Use in an exempt abandonment proceeding, 49 C.F.R. § 1152.29(d), or a Certificate of Interim Trail Use in a regular abandonment proceeding, 49 C.F.R. § 1152.29(c), when a private party files a statement of willingness to assume financial responsibility, and the railroad agrees to negotiate. *Goos*, 911 F.2d at 1286, 1295; see, *e.g.*, *Citizens Against Rails-To-Trails v. S.T.B.*, 267 F.3d 1144, 1153 (D.C. Cir. 2001); see also *Buffalo Tp. v. Jones*, 778 A.2d 1269, 1276 (Pa. Commw. 2001) ("Nowhere in Section 1247[d] does the Act require a municipality, which has accepted full responsibility for management of the right-of-way, including legal and financial

liability arising out of its use as a recreational trail, to obtain approval from the ICC in order to take advantage of the protections of the Act.").

In addition, the focus of the federal regulation of rail-trails is on the ability to restore the right-of-way to railroad use at a later date and to ensure that any present use does not interfere with the future potential. Specifically, 16 U.S.C. § 1247(d) requires that the interim use be subject to subsequent restoration of rail use and that the interim trail user (operator) takes responsibility for management of the right-of-way and all associated liability and taxes. See 49 C.F.R. § 1152.29(a).

The federal government's occupation of the field of regulating the rail-trail ends there, however. While the Supreme Court in *Preseault*, 494 U.S. at 17-18, recognized that the Trails Act serves the dual purposes of preserving established railroad rights-of-way in case of future activation and encouraging the development of trails for recreational use on an interim basis, the Trails Act does nothing to regulate the use of the trails during that interim. In other words, nothing in the federal regulatory scheme addresses specifics of the operation of a rail-trail. This distinction has been recognized by the STB in a written decision, *Idaho N. & Pac. R.R.—Abandonment & Discontinuance Exemption—In Washington & Adams Counties, ID*, STB Docket No. AB-433 (Sub-No. 2X) (STB served April 1, 1998).

In that decision, the STB emphasized that a trail operator must ensure satisfaction of the federal objective "that nothing occur that would preclude a railroad's right to reassert control over the right-of-way at some future time to revive active service" but must also "use the right-of-way so that it does not become a public nuisance." STB Docket No. AB-433 (Sub-No. 2X), at 9. The second obligation "is a state or local requirement, not a Board requirement. Federal preemption does not extend to the legitimate exercise of police power by states and localities." STB Docket No. AB-433 (Sub-No. 2X), at 9. The STB continued, stating:

" 'We note, however, that a trail use must comply with State and local land use plans, zoning ordinances, and public health and safety legislation. . . . This local regulation can address the Landowners' concerns about such issues as vandalism

or noise. . . . Indeed, the State and local agencies in the area are attuned to the specific interests and needs of their communities. . . . Nothing in our Trails Act rules or procedures is intended to usurp the right of state, regional and local entities to impose appropriate safety, land use, and zoning regulations on recreational trails.' [Citation omitted.]" STB Docket No. AB-433 (Sub-No. 2X), at 9-10.

See also *Bingham Twp. v. RLTD R. Co.*, 228 Mich. App. 154, 159 n.4, 576 N.W.2d 731 (1998) (stating that local "regulations may, for example, provide for the enforcement of criminal and civil laws, construction and maintenance of fencing, and limitation of noise" related to rails).

Accordingly, numerous states have enacted recreational use statutes that regulate the use and safety of rail-trails. See, *e.g.*, Cal. Pub. Res. Code Annot. § 5070 *et seq.* (West 2001); Fla. Stat. § 260.011 to § 260.018 (2010); Iowa Code § 465B.1 to 465B.4 (2011); Ky. Rev. Stat. Ann. § 148.610 *et seq.* (Michie 2009); Md. Nat. Res. Code Ann., § 5-1010 (Michie 2005); Minn. Stat. § 84.029 *et seq.* (2010); Ohio Rev. Code Ann. § 1519.01 to § 1519.99 (2007); Pa. Cons. Stat. § 5611 *et seq.* (1997); Wash. Rev. Code § 64.04.180 *et seq.* (2010); W. Va. Code Annot. § 5B-1A-1 *et seq.* (Michie 2010). Although these statutes vary widely in their content, nearly all such statutory schemes contain limitations on liability for various parties impacted by trail systems. Additionally, in various forms, many of the statutes define the scope of the state's police power as it relates to the maintenance and use of rail-trails.

The enactment of these statutes as part of the exercise of the states' police powers is consistent with a historical distinction between the role of the ICC/STB in regulating rail transportation and the states' role in regulating health and safety in ways that do not interfere with the operation or conduct of rail service. See, *e.g.*, *Ridgefield Park v. N.Y., Susqu. & Western Ry.*, 163 N.J. 446, 459, 750 A.2d 57 (2000) (Interstate Commerce Commission Termination Act, specifically 49 U.S.C. § 10501[b] [1996], "does not preempt 'non-discriminatory' public health and safety regulations that do not foreclose or restrict a railroad's ability to conduct its operations"); see also *Sunflour R.R., Inc. v. Paulson*, 670 N.W.2d 518, 523 (S.D. 2003) ("exclusive and preemptive jurisdiction granted to

the STB is over attempts to impose economic regulation on rail transportation," but state law claim for rent not established to be "regulation"); *In re Vermont Railway*, 171 Vt. 496, 503, 769 A.2d 648 (2000) (affirming preemption decision on zoning issues that "appears to have drawn the line between conditions that purported to regulate the operation of the railroad, including the transport of goods by the railway, and conditions that merely regulated activity regarding motor vehicles coming and going from the facility and the storage of materials at the facility").

This distinction suggests that the federal government has not traditionally regulated the sort of public health and safety issues that arise from use of a railroad right-of-way as a recreation trail. In other words, traditional public health and safety issues related to the use of recreational trails are not issues that are uniquely federal in nature. Hence, we conclude that the presumption that Congress did not intend to displace state law applies in this case. See *Buckman Co.*, 531 U.S. at 348; *Zimmerman*, 289 Kan. at 975. Similarly, as this discussion reveals, federal law is not sufficiently comprehensive nor the federal interest so dominant for us to find an intent to preempt state or local laws that regulate land use and health and safety issues related to the maintenance of a rail-trail. In summary, the doctrine of field preemption does not apply.

### b. *Conflict Preemption*

Consequently, as we turn to an analysis of Kanza's conflict preemption arguments, we start with the strong presumption that Congress did not intend to preempt local regulation. Nevertheless, we could still find conflict preemption because "state law is nullified to the extent that it actually conflicts with federal law," even though Congress has not displaced all state law in a given area. *Hillsborough County*, 471 U.S. at 713. As previously noted, the United States Supreme Court has identified two varieties of conflict preemption. One of the subcategories focuses on a facial or per se conflict where "it is impossible for a private party to comply with both state and federal requirements." *English*, 496 U.S. at 79. The other subcategory arises even if the state law is not facially in conflict with federal law if the "state law 'stands as an obstacle to

the accomplishment and execution of the full purposes and objectives of Congress.' [Citations omitted.]" *English*, 496 U.S. at 79.

We do not read any of Kanza's arguments as falling in the first subcategory; in other words, Kanza does not suggest that compliance with both the federal and state law is physically impossible. Rather, the arguments relate to obstacle preemption, which the United States Supreme Court recently explained operates such that "a state law that 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' of a federal law is pre-empted. [Citation omitted.]" *Williamson v. Mazda Motor of America, Inc.*, 562 U.S. ___, 131 S. Ct. 1131, 1136, 179 L. Ed. 2d 75 (2011).

As the Supreme Court reiterated in *Williamson*, the first step of analysis is identification of the law's objectives. As described in *Preseault*, the Trails Act's objectives are (1) to preserve established rail transportation corridors and railroad rights-of-way for future reactivation of energy efficient rail service and (2) to " 'encourage the development of additional trails,' " which assists recreational users " 'by providing opportunities for trail use on an interim basis.' [Citations omitted.]" *Preseault*, 494 U.S. at 17-18.

Kanza argues that the KRTA conflicts with these purposes and objectives because it imposes burdensome requirements that hinder the establishment of rail-trails. On appeal, the hindrance on which Kanza focuses is the requirement that nongovernmental responsible parties provide a bond or an escrow account for costs associated with the management of rail-trails. The impact of these hindrances, Kanza argues, is to set off a chain of falling dominos: the default of the trail operator because it cannot afford the bond or escrow reserve, the reversion of the trail to the railroad, and the abandonment of the line. Because this result would undercut the objectives of the Trails Act, Kanza argues the KRTA presents an obstacle and is preempted. In support of its position, Kanza cites *Friends of the East Lake Sam. v. City of Sammamish*, 361 F. Supp. 2d 1260 (W.D. Wash. 2005) (*Sammamish*), and *Nebraska Trails Council v. Surface Transp. Bd.*, 120 F.3d 901 (8th Cir. 1997).

In *Sammamish*, the plaintiffs, nonprofit organizations and their members, brought an action against a municipality claiming that the city ordinance's "practical alternative" public agency utility ex-

ception requirement hindered the county's efforts to implement an interim recreational trail and was, therefore, preempted by the Trails Act. The city's "practical alternatives" requirement did not permit destruction or alteration of sensitive areas for public agency and utility projects unless it was shown that there was no practical alternative with less impact to sensitive areas. The plaintiffs argued that any application of the city's "practical alternatives" requirement went above and beyond merely imposing safety, land use, or zoning regulations on a recreational trail developed on railbanked land.

The *Sammamish* court observed that "[c]onflict preemption applies where a state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citation omitted.]" *Sammamish*, 361 F. Supp. 2d at 1273. Citing the purposes of the Trails Act as recognized in *Preseault*, the *Sammamish* court agreed with the plaintiffs' contention that local regulations would apply only to the extent that they would not frustrate development of a recreational trail on the railbanked right-of-way. "The purpose of the Rails to Trails Act is not to encourage the development of recreational trails *near* inactive railroad rights of way," stated the *Sammamish* court, "it is to encourage the *transition* of these railbeds into recreational trails, and to preserve the right-of-way for possible future railroad reactivation." (Emphasis added.) *Sammamish*, 361 F. Supp. 2d at 1274.

Pursuant to the city ordinance, the hearing officer had found there were practical alternatives to the location of the interim recreational trail on the right-of-way; the effect of this finding was that the proposed trail had to be relocated to a location other than the railbed. This application of the ordinance demonstrated that the "practical alternatives" requirement stood as an " 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Sammamish*, 361 F. Supp. 2d at 1274. Consequently, the *Sammamish* court held that 16 U.S.C. § 1247(d) preempted the application of the city ordinance to any railbanked right-of-way.

Hence, the decision is an example of applying the conflicts preemption doctrine in a rails-to-trails context. Beyond that, the de-

cision has limited application to the facts of our case because the requirement of an alternative location for a recreational trail bears no similarity to a requirement that a trail operator provide a reserve to cover any losses that might result if the operator fails to meet its statutory obligation. Requiring a bond does not present an absolute impediment to rail-trail development. Rather, as the district court held, in this case the question is whether an obstacle was created by the manner in which the bond obligation was enforced. In that respect, the other case on which Kanza relies—*Nebraska Trails*—is somewhat more comparable.

In *Nebraska Trails*, organizations interested in fostering recreational trails sought review of the decision of STB establishing a fee of $150 on requests to use or acquire proposed-to-be-abandoned railroad rights-of-way for interim recreational trail use. The trail use condition filing fee was promulgated by the STB in accordance with the informal rulemaking procedures of § 553 of the federal Administrative Procedure Act. See 5 U.S.C. § 553 (2006).

In asserting numerous fairness and public policy arguments, the organizations argued that requiring a fee would discourage parties from requesting interim recreational trail use. Without any elaboration on the subject, the Eighth Circuit Court of Appeals stated:

"The STB has addressed adequately petitioners' public policy concerns that imposition of the fee will discourage parties from requesting trail use conditions by lowering the fee to $150 from the proposed $650 and by noting the availability of a fee waiver under procedures provided in 49 C.F.R. § 1002.2(e) (1996)." *Nebraska Trails*, 120 F.3d at 907.

The Eighth Circuit ultimately concluded that the fee imposed by the STB on parties filing interim recreational trail use requests was not " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' [Citation omitted.]" *Nebraska Trails*, 120 F.3d at 908-09.

Kanza argues that the STB's reduction of the application fee from $650 to $150 in *Nebraska Trails* "established a standard of what is considered burdensome" and a hindrance to the development of rail-trails. In this regard, Kanza also cites the decision of *NARPD v. STB*, 158 F.3d 135, 139 (D.C. Cir. 1998), for the proposition that the STB has rejected regulations that would be "ex-

pensive and burdensome." Kanza asserts that the STB's attempt to avoid burdensome regulations and the *Nebraska Trails* rationale establishes an "objective" standard that shows the amount of maintenance costs in the present case—$9,040—is burdensome and an obstacle to the objectives of Congress.

The comparison to the $150 at issue in *Nebraska Trails* is tenuous, as is reflected in a footnote in which the Eighth Circuit noted: "[T]he $150 fee represents only a small portion of the funds a trail use requester must amass in assuming financial responsibility for a railroad right-of-way." *Nebraska Trails*, 120 F.3d at 907 n.4. The implication of this conclusion, which is based on findings made by the STB when setting its fee schedule, is that a trail operator will incur expenses; there is no showing of an expectation that trail development will be without cost. Further, the STB did not make findings regarding the expenses that are anticipated or a threshold where the total expenses would be deemed burdensome. The full STB discussion implies there will be variances. See *STB Ex Parte No. 542*, 1 STB 179, 1996 WL 455536, at *7-9 (1996). Finally, we stress the reference to the fee being only a "small" portion of the total amount a rail-trail requester must amass, implying an expectation that the total will not be comparable to $150 as Kanza implies.

Consequently, we conclude these rulings do not support Kanza's position that a bond requirement and the setting of a bond amount at $9,040 create a conflict with the Trails Act. First, the KRTA's requirement that a bond or escrow account be available to assure fulfillment of a trail operator's statutory duties is related to the legitimate regulation of the use of the rail-trails and are an appropriate exercise of the state's authority to control safety, land use, and zoning related to rail-trails, an authority that is not expressly or impliedly preempted by the Trails Act. Second, while there could be circumstances where the state regulation and the establishment of a bond amount would be so onerous that it would conflict with the Trails Act, that situation is not presented in this case. The district court's factual findings in this regard are supported by substantial competent evidence. See *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009) (appellate court reviews

findings of fact to determine if supported by substantial competent evidence). Under the circumstances of this case, the requirement does not preclude the interim trail use or the ability to reactivate rail service in the future and, therefore, does not stand as an obstacle to accomplishing the objectives of the Trails Act.

## C. *Is the KRTA Preempted Because It Violates the Commerce Clause?*

As previously noted, Kanza also asserts a Commerce Clause argument and blends it with the preemption argument. See U.S. Const. art. I, § 8, cl. 3. It argues that a state can only exercise its police powers in a nondiscriminatory manner and in a manner that does not offend the Commerce Clause. In making this argument it relies on the following passage from an STB decision:

"Nothing in our Trails Act rules or procedures is intended to usurp the right of state or local entities to impose appropriate safety, land use, and zoning regulation on trails *so long as they are not applied in a discriminatory manner or in such a manner as to preclude the interim trail use or the ability to reactivate rail service in the future.*" (Emphasis added.) *Central Kansas Railway, L.L.C.—Abandonment Exemption—In Marion and McPherson Counties, KS*, STB Docket No. AB-406 (Sub-No. 6X), at 5 n.9 (STB served May 8, 2001).

It is not clear whether the STB was addressing the federal Supremacy Clause or the Commerce Clause when discussing the prohibition against discriminatory application of state regulations. For our purposes we need not sort out the doctrinal basis of the STB's reasoning because Kanza merely uses the passage to launch a Commerce Clause argument, which it supports by citing *In re Tax Appeal of CIG Field Services Co.*, 279 Kan. 857, 112 P.3d 138 (2005). *CIG* did not discuss the Supremacy Clause or preemption; rather, its analysis focused solely on the dormant Commerce Clause.

### 1. *Standard of Review/Framework of Dormant Commerce Clause Analysis*

In *CIG*, this court explained that the issue of whether a statute is constitutional is one of law, and our scope of review on issues of law is unlimited. *CIG*, 279 Kan. at 866-67. We further explained that historically the Commerce Clause has been interpreted

" ' "not only as authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation." [Citation omitted.] This restrictive aspect has been referred to as the "dormant" Commerce Clause. The dormant Commerce Clause prohibits states, unless authorized by Congress, from "attempting to advance their own commercial interests by curtailing the movement of articles of commerce, either into or out of the state." [Citation omitted.]' *Water District No. 1 v. Mission Hills Country Club*, 265 Kan. 355, 365-66, 960 P.2d 239 (1998)." *CIG*, 279 Kan. at 867.

The *CIG* decision then discussed the basic framework of the dormant Commerce Clause analysis that applied in that case, which dealt with the constitutionality of a Kansas property tax statute that differentiated between intracounty natural gas gathering systems and interstate and intercounty systems. Because of the tax issue that was present in that case, the court applied the test stated by the United States Supreme Court in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977). That test is unique to cases dealing with taxes, and several prongs of the *Complete Auto* test have no application to this case, *i.e.*, that the tax be applied to an activity with a substantial nexus to the state, the tax be fairly apportioned, and the tax be related to services provided in the state. The third prong of the *Complete Auto* test, however, is common to other strands of a dormant Commerce Clause analysis. That prong, which is the focus of Kanza's argument, requires that the tax not discriminate against interstate commerce. *CIG*, 279 Kan. at 870 (citing *Complete Auto*, 430 U.S. at 279).

The discrimination test was more recently discussed by the United States Supreme Court in *Department of Revenue of Kentucky v. Davis*, 553 U.S. 328, 338, 128 S. Ct. 1801, 170 L. Ed. 2d 685 (2008). In that decision, the Court explained that alleged violations of the dormant Commerce Clause are subject to a two-step inquiry. First, the court asks whether the law discriminates on its face against interstate commerce. "A discriminatory law is 'virtually *per se* invalid,' [citations omitted] and will survive only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.' [Citations omitted.]" *Davis*, 553 U.S. at 338.

The second step applies if the law does not discriminate for a forbidden purpose. In this step, the court engages in a balancing test as set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970). *Davis*, 553 U.S. at 338-39. Here, Kanza does not cite *Pike* or argue for *Pike* scrutiny. Nor does Kanza raise any other strand of the dormant Commerce Clause analysis, such as the implications arising because the State of Kansas or local units of government are market participants operating competing recreational trails. See *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 813-14, 96 S. Ct. 2488, 49 L. Ed. 2d 220 (1976). Issues not briefed by an appellant are deemed waived and abandoned. *Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, 395, 204 P.3d 562 (2009). Consequently, we will not address these other strands of analysis or the *Pike* test, and our analysis will be limited to the first step of the analysis, *i.e.*, whether the law is discriminatory in a manner prohibited by the dormant Commerce Clause.

As discussed in *CIG*, the threshold consideration is whether a state statute differentiates between similarly situated entities. Generally, entities are similarly situated if they serve the same market. The parties agree that there are trail operators in the same market who are not covered by the KRTA. The next consideration is whether the regulatory measures discriminate against out-of-state competitors in that market. *CIG*, 279 Kan. at 867-68. This discrimination can be found (1) from the face of a state law; (2) from the purposes of those enacting the law, *i.e.*, a discriminatory intent, or (3) from its effect. *CIG*, 279 Kan. at 871 (citing *Amerada Hess Corp. v. N.J. Taxation Div.*, 490 U.S. 66, 75, 109 S. Ct. 1617, 104 L. Ed. 2d 58 [1989]). Kanza argues that the KRTA discriminates in each of the three ways.

### a. *Facial Discrimination*

First, Kanza argues there is facial discrimination because the KRTA's definition of "recreational trail" includes only those that are located in railbanked rights-of-way under 16 U.S.C. § 1247(d). Nevertheless, just because there is a differentiation—discrimination, if you will—does not mean there is discrimination that violates

the dormant Commerce Clause. "In this context, ' "discrimination" simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.' [Citations omitted.]" *United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority*, 550 U.S. 330, 338, 127 S. Ct. 1786, 167 L. Ed. 2d 655 (2007); see *CIG*, 279 Kan. at 871. The focus on whether out-of-state competitors are burdened is "driven by concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.' [Citation omitted.] The point is to 'effectuat[e] the Framers' purpose to "prevent a State from retreating into . . . economic isolation [citations omitted] . . . ." ' " *Davis*, 553 U.S. at 337-38.

Miami County argues that Kanza, which is a not-for-profit Kansas corporation, cannot meet this threshold test for several reasons. First, it argues that the rail line at issue here is totally in-state. This may be true, but we cannot verify this on the record before us because we do not have information regarding the full scope of Kanza's operation or information regarding whether this rail-trail connects to other recreational trails and eventually to an out-of-state recreational trail. Our review is hampered because Miami County did not ask the district court to make findings or object to the lack of findings regarding this question. A litigant must ensure the findings and conclusions by the district court are sufficient to support appellate argument, by filing a motion invoking the court's duty under Supreme Court Rule 165 (2010 Kan. Ct. Rule Annot. 242), if necessary. *State v. Edwards*, 290 Kan. 330, Syl. ¶ 5, 226 P.3d 1285 (2010). Second, Miami County argues that Kanza has not shown discrimination against out-of-state competitors. It points out that Kanza's argument regarding the differentiation between rail-trails and other trails has nothing to do with creating an economic benefit for in-state competitors that burdens out-of-state competitors. In other words, the differentiation is not based on the market that is served—interstate and in-state trail operators are treated the same if they operate a rail-trail. Similarly, interstate and in-state trail operators who operate other categories of recreational trails, *i.e.*, those not located in railbanked rights-of-way, are treated

the same, and there is no facial economic protectionism for in-state competitors.

Kanza presents a multifaceted reply. It first argues the KRTA discriminates against interstate commerce because it burdens rail-trails, and rail-trails impact interstate commerce. See *Preseault v. ICC*, 494 U.S. 1, 110 S. Ct. 914, 108 L. Ed. 2d 1 (1990). Kanza's argument seems to suggest that the only type of recreational trail impacting interstate commerce is one that is located in a railbanked right-of-way. Yet, the KRTA's legislative history, which is a part of the record of this case and can appropriately be considered by us (see K.S.A. 60-409[c]), includes testimony regarding (1) the significant economic impact of recreational trails that preexisted the enactment of the KRTA and which were not then and are not now covered by the statute and (2) the impact of current and future plans for interstate rail-trails.

In addition, Kanza's argument appears to suggest that the Commerce Clause prohibits all discriminatory treatment of competitors in a market that impacts interstate commerce, even if the discrimination does not draw a distinction between in-state and out-of-state competitors. This argument ignores the purpose and history of the dormant Commerce Clause. Two points are relevant. First, mere impact on interstate commerce is not the litmus test. It is recognized that when Congress does not preempt state regulation in an area that impacts interstate commerce, the states will have some impact on interstate commerce. See *Northwest Cent. Pipeline v. Kan. Corp. Comm'n*, 489 U.S. 493, 524, 109 S. Ct. 1262, 103 L. Ed. 2d 509 (1989) (recognizing that with respect to "reservation to the States" of regulation over gas production rates, Congress cannot but have contemplated that state oversight would affect interstate commerce). Second, the dormant Commerce Clause does not prohibit all discrimination, it prohibits "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. [Citations omitted.]" *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 273, 108 S. Ct. 1803, 100 L. Ed. 2d 302 (1988). As applied in this case, the fact a rail-trail impacts interstate commerce and is treated differently than another category of recreational trail does not violate the dormant

Commerce Clause if the latter trail also impacts interstate commerce and the differentiation does not provide an economic advantage to in-state competitors and does not burden out-of-state competitors.

In that regard, the differentiation between rail-trails and other categories of recreational trails that is made in the KRTA has a different type of impact than did the tax statute at issue in *CIG*, and, as a result, that decision does not support Kanza's argument. In *CIG*, a statutory definition created a differentiation by exempting intracounty natural gas gathering systems. The impact was that these intracounty systems received a tax benefit not available to interstate and intercounty systems. The argument that there was a Commerce Clause violation focused on the favorable treatment of intracounty systems and the unfavorable treatment of interstate systems. This distinction created a classic situation of in-state benefit versus out-of-state burden. Nevertheless, in response, it was argued that the tax burden also fell on in-state competitors, *i.e.*, intercounty systems. Because intercounty systems were treated the same as interstate systems, it was argued that the tax did not discriminate against interstate competitors. We rejected the argument that this insulated the discrimination against out-of-state competitors from the dormant Commerce Clause, citing *Dean Milk Co. v. Madison*, 340 U.S. 349, 354, 71 S. Ct. 295, 95 L. Ed. 329 (1951). *CIG*, 279 Kan. at 873-74.

In *Dean Milk* the United States Supreme Court considered a Madison, Wisconsin, ordinance that barred the sale of milk not processed within 5 miles of the city. Even though the ordinance impacted Wisconsin producers who were outside the 5-mile radius the same as an out-of-state producer, the Court found a Commerce Clause violation. The Court noted the ordinance "erect[ed] an economic barrier protecting a major local industry against competition from without the State." *Dean Milk Co.*, 340 U.S. at 354; *cf. Brimmer v. Rebman*, 138 U.S. 78, 83, 11 S. Ct. 213, 34 L. Ed. 862 (1891) (" 'a burden imposed by a state upon interstate commerce is not to be sustained simply because the statute imposing it applies alike to the people of all the states, including the people of the state enacting such statute' "). Applying these cases, we concluded

in *CIG* that the tax statute violated the dormant Commerce Clause even though "it is imperfectly or incompletely" facially discriminatory. *CIG*, 279 Kan. at 873.

Kanza does not cite to any provision of the KRTA that differentiates between in-state and out-of-state competitors and, therefore, does not construct a similar argument to that considered in *CIG*. We note, however, that there is a distinction arising from the exemption of governmental bodies, which are inherently in-state, from the requirement to post a bond. As previously noted, by not briefing or raising an argument regarding the impact of government competitors, Kanza has waived the argument. See *Kingsley*, 288 Kan. at 395. Additionally, there is a clear nondiscriminatory purpose in the bond requirement, specifically, to hold the taxpayers harmless. Requiring a bond to indemnify taxpayers serves no purpose when taxpayers are already footing the bill for a publically funded trail. In other words, government bodies are burdened as well. Furthermore, when we focus on the distinction made by Kanza—between rail-trails and other categories of recreational trails—we can find no economic discrimination in the KRTA between in-state and out-of state competitors. In other words, there is no economic protectionism evident on the face of the KRTA and nothing that shows that one type of competitor is "favored because they were local." *Davis*, 553 U.S. at 341 n.9.

Hence, Kanza fails to establish facial discrimination. Accordingly, we conclude "there is no explicit discriminatory design" to the KRTA. *Amerada Hess*, 490 U.S. at 76.

### b. *Intent to Discriminate*

But Kanza also argues that even if there is no facial discrimination, there is an intent to discriminate and a burden placed on interstate commerce in violation of the dormant Commerce Clause. The only evidence of the Kansas Legislature's intent with regard to the KRTA is found in the language of the statute itself and the legislative history. As noted, the plain language does not suggest an intent to discriminate against out-of-state economic interests based on the distinction between rail-trails and other cat-

egories of recreational trails. Nor can we find such an intent reflected in the legislative history.

Kansas established recreational trail laws in 1996 by the passage of H.B. 2711. As originally proposed, H.B. 2711 placed conditions on all recreational trail developers and operators, whether public or private and whether or not on railbanked rights-of-way. Proponents of the bill—primarily Kansas Farm Bureau and the Kansas Livestock Association—articulated that such legislation would address concerns of adjacent landowners, protect their property interests, and protect the safety interests of individuals utilizing the trail without unduly burdening rail-to-trail development or operation. One proponent testified that similar concerns of adjacent landowners had been addressed when the Kansas Legislature enacted state laws directing the Kansas Department of Wildlife and Parks to meet certain conditions relating to the development and operation of other categories of recreational trails.

Opposition testimony presented at the hearings on H.B. 2711 came primarily from municipalities. Generally, these opponents sought local autonomy rather than state regulation. Some opponents also drew a distinction between a recreational trail built on a defined right-of-way with adjacent landowners, such as a rail-trail, and recreational trails built on public property with no immediately adjacent private landowners. In addition, the director of a city park department testified that his city had developed the first operational rail-trail; he asked the legislature not to pass the legislation because it would add to the cost of rail-trail development, which his community hoped to continue to do.

Ultimately, substitute H.B. 2711 (later K.S.A. 58-3211 *et seq.*) defined a recreational trail as a "trail created pursuant to subsection (d) of 16 U.S.C. [§] 1247 (1983)." K.S.A. 58-3211(b). While there is no clear statement of intent, the passage of the legislation indicates the legislature rejected the view that no legislation should be passed, even though a local competitor—a city in Kansas—suggested the legislation would burden its future ability to develop a rail-trail. See K.S.A. 58-3211(c) ("[r]esponsible party" defined to include governmental entities). This history is contrary to a suggestion that there was an intent to protect in-state competitors.

Rather, perhaps because of the distinctions drawn between rail-trails and other categories of recreational trails, the legislature chose to exempt trails developed on land other than railroad rights-of-way.

In sum, Kanza has presented no evidence that the KRTA was "motivated by an intent to confer a benefit upon local industry not granted to out-of-state industry." *Amerada Hess*, 490 U.S. at 76.

### c. Discriminatory Effect

As for the third factor in *Amerada Hess*—the effect of unduly burdening interstate commerce—Kanza argues that this factor is present in that the KRTA creates economic interests which are beneficial to recreational trails created outside the rails-to-trails context and are burdensome to rail-trails created pursuant to 16 U.S.C. § 1247(d) (2010).

Specifically, Kanza argues there is an undue burden on rail-trails in that, compared to the general Kansas fence laws found at K.S.A. 29-101 *et seq.*, the KRTA, specifically K.S.A. 58-3212, places more rigorous fencing requirements on the operator of a rail-trail. In the district court proceeding, the court determined that K.S.A. 58-3212 is a more specific statute and, therefore, controls over the more general fencing statutes, K.S.A. 29-101 *et seq.* Kanza does not advance any arguments on appeal relating to the issue of whether the fencing requirements of the KRTA control over the fencing requirements of the general Kansas fence laws, K.S.A. 29-101 *et seq.* Consequently, that issue has been abandoned on appeal. See *Kingsley*, 288 Kan. at 395 (issues not briefed are deemed abandoned). But Kanza attempts to morph its argument into a Commerce Clause discrimination claim by complaining about the costs associated with the fencing responsibilities placed by the KRTA on the party responsible for rail-trail management. Likewise, Kanza complains that the other costs associated with its managerial duties under the KRTA—such as costs for weed control, litter control, and signage—are discriminatory because the KRTA only applies to this specific category of recreational trail in Kansas.

None of Kanza's arguments regarding undue burden are persuasive. As earlier noted, representatives of Kansas communities—

in-state competitors—voiced identical complaints to the legislature. Once again, as with all of Kanza's Commerce Clause discrimination arguments, the argument fails because the KRTA does not provide a benefit to local competitors or burden interstate entities in ways it does not burden local, nonpublic competitors.

## ISSUE 2: EQUAL PROTECTION

Next, Kanza argues that the KRTA violates the Equal Protection Clauses of the federal and state constitutions. This contention lacks merit.

### A. *Standard of Review/Equal Protection Principles*

The Fourteenth Amendment to the United States Constitution guarantees equal protection of the laws, and the Kansas Constitution Bill of Rights § 1 provides virtually the same protection. See *State v. Limon*, 280 Kan. 275, 283, 122 P.2d 22 (2005). When the constitutionality of a statute is challenged on the basis of an equal protection violation, courts must construe the statute as constitutional if there is any reasonable way to do so. Consequently, in reviewing a statute we presume that it is constitutional and resolve all doubts in favor of its validity. An appellate court conducts unlimited review of this question because it presents a question of law. See *State v. Gaudina*, 284 Kan. 354, 372, 160 P.3d 854 (2007); *Injured Workers of Kansas v. Franklin*, 262 Kan. 840, 844, 942 P.2d 591 (1997).

The first step of an equal protection analysis is to determine the nature of the legislative classifications and whether the classifications result in arguably indistinguishable classes of individuals being treated differently. Only if there is differing treatment of similarly situated individuals are the federal and Kansas Equal Protection Clauses implicated. See *State v. Salas*, 289 Kan. 245, 248, 210 P.3d 635 (2009); *Hodges v. Johnson*, 288 Kan. 56, 72, 199 P.3d 1251 (2009); see also *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985) (guiding principle of equal protection analysis is that similarly situated individuals should be treated alike). Here, as with the previous issue, the parties agree that the KRTA treats arguably indis-

tinguishable classes, *i.e.*, parties responsible for recreational trails, differently by only placing requirements on rail-trails created pursuant to 16 U.S.C. § 1247(d).

After determining the nature of the legislative classifications, a court examines the rights which are affected by the classifications. The nature of the rights dictates the level of scrutiny to be applied. *Salas*, 289 Kan. at 248-49; *Hodges*, 288 Kan. at 72-73. Federal and Kansas courts have long delineated three levels of scrutiny in equal protection cases: (1) the rational basis standard to determine whether a statutory classification bears some rational relationship to a valid legislative purpose; (2) the heightened or intermediate scrutiny standard to determine whether a statutory classification substantially furthers a legitimate legislative purpose; and (3) the strict scrutiny standard to determine whether a statutory classification is necessary to serve some compelling state interest. *Limon*, 280 Kan. at 283-84; see *Grutter v. Bollinger*, 539 U.S. 306, 326, 123 S. Ct. 2325, 156 L. Ed. 2d 304 (2003) (strict scrutiny); *Mississippi University for Women v. Hogan*, 458 U.S. 718, 723-24, 102 S. Ct. 3331, 73 L. Ed. 2d 1090 (1982) (heightened scrutiny); *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964) (rational basis). In this case, Kanza has not argued that either the heightened scrutiny or strict scrutiny standard should be applied; it accepts the application of the rational basis standard.

The final step of the analysis requires determining whether the relationship between the classifications and the object desired to be obtained withstands the applicable level of scrutiny. *Limon*, 280 Kan. at 283-84. Where, as in this case, a party attacks a statute as facially unconstitutional under the Equal Protection Clause for failing to satisfy the rational basis standard, the party must demonstrate that "no set of circumstances exist" that survive constitutional muster. *Injured Workers of Kansas*, 262 Kan. at 850. For this reason, it is not enough to "[s]imply point[ ] out that [a statute] might not be rationally related to the state objectives sought under one set of facts." *Injured Workers of Kansas*, 262 Kan. at 851. Instead, a party "asserting the unconstitutionality of a statute under the rational basis standard 'ha[s] the burden "to negative every conceivable basis which might support [the classification]." ' [Citations

omitted.]" *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, 253, 930 P.2d 1 (1996), *cert. denied* 520 U.S. 1229 (1997); see *Barrett v. U.S.D. No. 259*, 272 Kan. 250, Syl. ¶ 2, 32 P.3d 1156 (2001) ("When a statute is attacked on equal protection grounds, the general rule is that the statute is presumed constitutional, and the burden is on the party attacking the statute to prove otherwise.").

The district court pointed out that Kanza could cite to no other jurisdiction in which an appellate court has held that a state rails-to-trails statutory scheme violated equal protection rights. Further, the court found there is a rational basis for the requirements placed on the parties responsible for rail-trails: "[T]he responsibilities imposed upon [Kanza] pursuant to the KRTA in this action have a rational basis in preserving and promoting a safe trail for users, while protecting the private property rights of adjacent landowners."

Kanza is dissatisfied with the district court's finding and argues that the court's finding lacks an analysis of how that rational basis is distinguishable from recreational trails established outside of the rails-to-trails context. Kanza argues that there is no rational basis for differentiating between rail-trails and other categories of recreational trails. Further, Kanza turns again to the legislative history of the KRTA and argues that, based on the fact that K.S.A. 58-3215 as it existed at the time this action was filed permitted a city or county to "institute procedures for recourse against the responsible party pursuant to 16 U.S.C. 1247 (1983) and 49 C.F.R. 1152.29 (1986) upon the failure of the responsible party to comply with the provisions of this act," K.S.A. 58-3215, the Kansas Legislature probably enacted the KRTA to protect Kansans' reversionary property rights in the railbanked right-of-way. Kanza reasons that if interim recreational trail use permits are revoked by the STB for noncompliance with state trail requirements, the railroad right-of-way may be deemed abandoned and the abandoned railroad right-of-way then reverts back to the owner of that property. According to Kanza, the legislature placed "oppressively burdensome responsibilities" on interim trail operators in order to discourage railbanking and to promote the reversion of the railroad right-of-way to the landowner. The protection of reversionary

property interests, argues Kanza, is not a proper rational basis because it contravenes Congress' intent to promote railbanking. Kanza points this court to *Jost v. Surface Transp. Bd.*, 194 F.3d 79 (D.C. Cir. 1999), for support.

However, we need look no further than the legislative history to find reasons for distinguishing rail-trails from other categories of recreational trails. Miami County points to references in the legislative history testimony indicating that numerous recreational trails had already been established outside the rails-to-trails context at the time the KRTA was enacted and were already part of maintenance programs in conjunction with local agencies. In addition, as previously discussed, those who testified discussed the buffer that could be and often is provided between other types of recreational trails and adjacent landowners as compared to railroad rights-of-way that are often narrow corridors. This distinction could justify more stringent regulation of matters that could develop into a public nuisance to adjoining landowners such as litter, the use of vehicles, or trespassing.

Further, there is no guidance in the federal provisions regarding the upkeep of rail-trails. As observed by the STB, "the Trails Act does not require the trail to be 'developed' in any particular way. There can be differing types or levels of trail use, and this agency has never become involved in determining the type or level of trail for a specific right-of-way." *Central Kansas Railway, L.L.C.— Abandonment Exemption—In Marion and McPherson Counties, KS*, STB Docket No. AB-406 (Sub-No. 6X), at 5 n.10 (STB served May 8, 2001). This lack of federal guidance in the area of safety and land use provides a rational basis for imposing requirements on parties responsible for rail-trails created pursuant to 16 U.S.C. § 1247(d) because, as opposed to other categories of recreational trails where a right-of-way does not need to be preserved for any particular future use, rail-trails are to be maintained in a manner that will facilitate the ability to reactivate rail service in the future. *Preseault*, 494 U.S. at 18; 16 U.S.C. § 1247(d); 49 C.F.R. § 1152.29(a) (2009). The KRTA imposes this requirement by, for example, requiring maintenance of bridges, culverts, roadway in-

tersections, and crossings on the trail. See K.S.A. 58-3212(a)(11)(A).

The district court found that there is no evidence suggesting that the KRTA is intended to accomplish anything other than the purposes of the federal Trails Act—in short, preservation of railroad rights-of-way and encouragement of interim recreational trail development. We agree. The district court correctly determined that Kanza failed to show that the KRTA abridges constitutionally protected equal protection rights.

## ISSUE 3: JURISDICTION TO SET THE BOND

The final contention raised by Kanza is that the district court did not have jurisdiction to set the amount of bond or escrow account required under K.S.A. 58-3212(b) if the parties fail to agree on the amount of the bond. We hold that the district court did have jurisdiction.

### A. *Preservation of Issue and Parties' Arguments*

Kanza only raised a cursory question about jurisdiction before the district court, placing the following short statement in its motion to dismiss: "The parties are at a stand-off with each other, and under the KRTA this Court may not even have jurisdiction to decide what a reasonable escrow amount is, as the law is silent about who should make that decision in the event of a permanent difference of opinion."

Regardless, to the extent subject matter jurisdiction is implied, such a question may be raised at any time, including for the first time on appeal or even on an appellate court's own motion. *Padron v. Lopez*, 289 Kan. 1089, 1103, 220 P.3d 345 (2009); *Shipe v. Public Wholesale Water Supply Dist. No. 25*, 289 Kan. 160, 166, 210 P.3d 105 (2009).

In raising the jurisdictional challenge on appeal, Kanza attacks the district court's jurisdiction from multiple angles. First, Kanza takes a "plain reading" approach. It argues that under a plain reading of K.S.A. 58-3215, until the parties meet the "amount agreed upon" criteria of K.S.A. 58-3212(b), a proceeding seeking recourse is "unavailable" to Miami County; therefore, the district court

lacked jurisdiction to order the amount of the bond or escrow account. Second, Kanza argues that a writ of mandamus under K.S.A. 60-801 was "unavailable" to Miami County because the parties had not agreed upon the amount of the bond or escrow account. Kanza asserts that a mandamus proceeding would only be available to enforce an agreement between the parties as to the amount of the bond or escrow account. Third, Kanza argues that Miami County lacked "standing" to bring this action to compel Kanza's posting of a bond or establishing an escrow account because Miami County has not been "aggrieved," as provided in K.S.A. 2010 Supp. 58-3215. (A few months after this action was filed, an amendment to K.S.A. 58-3215 became effective. Although there are differences in the two versions, both versions provide that any county "aggrieved" may bring an action to enforce the KRTA. L. 2006, ch. 178, sec. 2 [now codified at K.S.A. 2010 Supp. 58-3215]. Kanza does not rely on the portions of K.S.A. 58-3215 that differ pre- and post-amendment to argue that the district court lacked jurisdiction.)

## B. *Standard of Review and the Statute*

This issue involves statutory interpretation and the jurisdiction of the district court. Interpretation of a statute is a question of law over which an appellate court has unlimited review. *Double M Constr. v. Kansas Corporation Comm'n*, 288 Kan. 268, 271, 202 P.3d 7 (2009). Also, jurisdictional questions are questions of law over which appellate review is unlimited. *Harsch v. Miller*, 288 Kan. 280, 286, 200 P.3d 467 (2009).

When interpreting a statute, an appellate court must first determine the legislature's intent by reviewing the statutory language used and giving ordinary words their ordinary meaning. *Double M Constr.*, 288 Kan. at 271. " '[O]nly if the statute's language or text is unclear or ambiguous [do] we move to the next analytical step, applying canons of construction or relying on legislative history construing the statute to effect the legislature's intent.' " *Double M Constr.*, 288 Kan. at 271-72 (quoting *In re K.M.H.*, 285 Kan. 53, 79, 169 P.3d 1025 [2007], *cert. denied* 555 U.S. 937, 129 S. Ct. 36 [2008]).

We are called on to apply these rules to the following provisions from the KRTA:

"(b) If the responsible party is not a governmental entity, the responsible party *shall file* with the county clerk of each county where a portion of the recreational trail is or will be located *a bond or proof of an escrow account in a Kansas financial institution, as defined by K.S.A. 16-117 and amendments thereto, payable to the county.* The bond or proof of an escrow account shall be filed at the time of transfer of the deed to the responsible party and annually thereafter. The bond or escrow account shall be conditioned on the responsible party's performance, and shall be in *an amount agreed upon* between the responsible party and the county commission as *sufficient to fully cover the annual costs*, of:

"(1) Weed control along the trail, as required by subsection (a)(1);

"(2) litter control along the trail, as required by subsection (a)(4);

"(3) maintenance of the trail in a condition that does not create a fire hazard, as required by subsection (a)(5);

"(4) installation and maintenance of fencing between the trail and adjacent property within the county, as required by subsection (a)(10); and

"(5) installation and maintenance of signs along the trail, as required by subsections (a)(3), (a)(4) and (a)(11)(C).

. . . .

"(d) The provisions of this section shall apply to all recreational trails, regardless of when approval to enter into negotiations for interim trail use is or was received from the appropriate federal agency." (Emphasis added.) K.S.A. 58-3212(b), (d).

## C. *Construction*

Kanza takes a circuitous route to conclude that the district court lacked jurisdiction to set the amount of the required bond. Kanza contends that under the plain language of the statutes, it has not "fail[ed] to comply" with the duties of the KRTA under K.S.A. 58-3212(b) until it fails to post a bond for "an amount agreed upon" between the parties. See K.S.A. 2010 Supp. 58-3215. Failure to agree to an amount, according to Kanza, does not equate to a failure to comply.

Yet another portion of the provision seems equally as clear when read in isolation. It states that "the responsible party shall file with the county clerk . . . a bond or proof of an escrow account." K.S.A. 58-3212(b). Nevertheless, the statute is ambiguous because of a gap in the statute—it does not define what bond shall be filed if agreement is not reached.

The district court determined the legislature's intent was to allow a city or county to use a judicial remedy to enforce the requirement that a bond be posted or an escrow account established. The district court observed that the federal law—16 U.S.C. § 1247 (2010) and regulations promulgated pursuant to the law, specifically 49 C.F.R. § 1152.29—do not impose any guidelines for rail-trail maintenance. And our Kansas statute is silent regarding the remedy when parties are unable to agree upon the amount of the bond or escrow account. The district court stated:

"This Court cannot help but believe that the legislative intent behind the KRTA was for such issues to be resolved by courts of local jurisdiction. In any event, if the legislature did not intend local courts to determine such issues, the result would be a stalemate in the development of trails over abandoned railway corridors. Such a result would be contrary to the dual purpose of the [Trails Act] as stated in [*Friends of the East Lake Sam. Trail v. City of Sammamish*, 361 F. Supp. 2d 1260, n.20 (W.D. Wash. 2005)]: (1) to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, and (2) to encourage the development of additional trails and assist recreational users by providing opportunities for trail use on an interim basis. [Citation omitted.] The Court must presume that the statutory intent was consistent with Congressional intent."

In addition to avoiding "stalemate" conditions, Miami County argues that if this court adopts Kanza's interpretation of the KRTA, such a result would be inconsistent with another rule of statutory construction, the presumption that the legislature does not intend to enact useless or meaningless legislation. See *In re Adoption of G.L.V.*, 286 Kan. 1034, 1041, 190 P.3d 245 (2008). We agree.

As a general rule, courts should construe statutes to avoid unreasonable results and should presume that the legislature does not intend to enact useless or meaningless legislation. *Hawley v. Kansas Dept. of Agriculture*, 281 Kan. 603, 631, 132 P.3d 870 (2006). Courts ascertain the legislature's intent behind a particular statutory provision

"from a general consideration of the entire act. Effect must be given, if possible, to the entire act and every part thereof. To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible. [Citation omitted.]" *In re Marriage of Ross*, 245 Kan. 591, 594, 783 P.2d 331 (1989).

See *State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas*, 275 Kan. 763, Syl. ¶ 2, 69 P.3d 1087 (2003). Thus, in cases involving statutory construction, "courts are not permitted to consider only a certain isolated part or parts of an act, but are required to consider and construe together all parts thereof *in pari materia*." *Kansas Commission on Civil Rights v. Howard*, 218 Kan. 248, Syl. ¶ 2, 544 P.2d 791 (1975).

Taking into consideration the entire KRTA, we observe that the legislature intended to establish duties of a responsible party that develops, operates, or maintains a rail-trail, including the requirement for a nongovernmental responsible party to post a bond or establish an escrow account to ensure that annual costs, enumerated in K.S.A. 58-3212, are covered. Under Kanza's interpretation, a trail operator could defeat this intent by refusing to agree to any bond amount. This would leave taxpayers at risk and without the bond that is designed to indemnify taxpayers, such as those in Miami County, from having to pay for damages that might result from the failure of an operator, such as Kanza, to perform its duties. Rather than construe the bond and escrow provision in a way that would defeat the provision, we conclude Miami County has the right to demand compliance with the statute. Kanza's plain language argument fails.

## D. *Writ of Mandamus*

Kanza makes virtually identical arguments to contend that a writ of mandamus under K.S.A. 60-801 was "unavailable" to Miami County because the parties had not agreed upon the amount of the bond or escrow account. Kanza asserts that a mandamus proceeding would only be available to enforce an agreement between the parties as to the amount of the bond or escrow account.

K.S.A. 60-801 sets forth a litigant's right to the remedy of mandamus. It states: "Mandamus is a proceeding to compel some inferior court, tribunal, board, or some *corporation* or person to perform a specified duty, which duty results from the office, trust, or official station of the party to whom the order is directed, or *from operation of law*." (Emphasis added.) Kanza makes no argument about the statute's applicability other than to suggest that it had

not breached a duty because there was no bond agreement in place.

This argument is contrary to the mandatory language in K.S.A. 58-3212(b), *i.e.*, a responsible party "shall file" a bond or proof of escrow. This language clearly places upon a nongovernmental responsible party the requirement, *i.e.*, duty, to file a bond. The statute's ambiguity regarding the amount of bond to be posted in lieu of an agreement does not alter this duty. Further, because of this ambiguity, it was appropriate for Miami County to seek a court ruling because " '[m]andamus [is] an appropriate avenue to obtain an authoritative interpretation of the law for the guidance of public officials in their administration of public business.' " *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 907-08, 179 P.3d 366 (2008) (quoting *Alpha Med. Clinic v. Anderson*, 280 Kan. 903, 916, 128 P.3d 364 [2006]).

### E. *Standing*

Kanza also argues that Miami County lacked "standing" to bring an action to compel Kanza to post a bond or establish an escrow account because Miami County has not been "aggrieved."

Standing is "a party's right to make a legal claim or seek judicial enforcement of a duty or right." Black's Law Dictionary 1536 (9th ed. 2009). Under the traditional tests for standing, "a person must demonstrate that he or she suffered a cognizable injury and that there is a causal connection between the injury and the challenged conduct." *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 761, 189 P.3d 494 (2008).

Kanza states in its appellate brief that "[t]here is no evidence or finding that Miami County was 'aggrieved,' which may be interpreted to mean the equivalent of 'standing.' " Kanza concedes, however, that its failure to enter into an agreement with Miami County regarding the amount of the bond/escrow account "may be sufficient."

As observed by Miami County, Kanza essentially ignores the language of K.S.A. 58-3212, which establishes duties for a responsible party, including the posting of a bond with the county. Clearly, this bond was for the benefit of Miami County and its taxpayers.

The failure to post the bond violated a statute designed to protect those interests, and in bringing an action in district court, Miami County was trying to enforce that statutory requirement. As such, K.S.A. 2010 Supp. 58-3215, which allows enforcement by a city or county "aggrieved" because of a failure to comply with the KRTA to take judicial action, granted Miami County standing. Kanza's "standing" argument fails.

### F. *Amount of the Bond*

In the alternative, Kanza briefly asserts, with no supporting authority, that even if the district court had jurisdiction, the amount of the bond/escrow account ordered by the district court was arbitrary.

"In evaluating the evidence to support the district court's factual findings, an appellate court does not weigh conflicting evidence, evaluate witnesses' credibility, or redetermine questions of fact." *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009); accord *In re Estate of Hjersted*, 285 Kan. 559, 571, 175 P.3d 810 (2008).

Kanza acknowledges that Miami County presented evidence to support the amount of the bond, and Kanza did not object to any of the plaintiff's evidence. Our review of the record shows that the evidence presented by Miami County was never controverted by Kanza. Before determining the amount of the bond to be posted by Kanza, the district court considered the file, the parties' arguments, and the evidence presented to the court. The district court made extensive and clear findings regarding the computation of the bond amount, and there was substantial competent evidence to support the district court's finding that Kanza must post a bond, or provide proof of escrow, in the amount of $9,040.

Affirmed.

DAVIS, C.J., not participating.

LEBEN, J., assigned.

* * *

LEBEN, J., concurring: I join fully in the analysis and holdings of the excellent opinion Justice Luckert has written for the court. I write separately, however, to express my respectful disagreement with a statement regarding the interpretation of statutes that has found its way into the court's recent cases—a statement that is contrary to the long tradition of statutory interpretation in Kansas and to the most thoughtful views of scholars in the area.

In its opinion, the court says that when an initial look at a statute's words reveals no ambiguity, the court will not use the tools of statutory interpretation or consider even clear statements in legislative-history materials that may contradict the apparent plain meaning of the statute. It's not clear to me that this statement has actually been decisive in any case to date, and it certainly is not decisive here. But following that view is out of step with Kansas Supreme Court opinions dating back at least to 1863, and it could lead to decisions that would seem to me both incorrectly decided and lacking in respect for the other branches of our state government.

For the Kansas Supreme Court to lead a movement to ignore everything but the text when the text seems clear—but may in fact be contradicted by other factors the court refuses to consider—is ironic when one considers that two of the most prominent historic figures in statutory interpretation have been Kansans, and both rejected a strict textualist approach. David Brewer (who practiced law and first became a judge in Leavenworth before serving on the Kansas Supreme Court) is the only Kansas jurist to have served on the United States Supreme Court. One of his most famous opinions is also arguably the most famous statutory-interpretation case in American history, *Holy Trinity Church v. United States*, 143 U.S. 457, 12 S. Ct. 511, 36 L. Ed. 226 (1892). In it, the Court applied the "familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers." 143 U.S. at 459. While such a potentially broad principle must not have an unlimited application, the *Holy Trinity Church* case has been cited in more than 1,000

court decisions, including 5 in the Kansas appellate courts. *E.g.,
Cardarella v. City of Overland Park*, 228 Kan. 698, 705, 620 P.2d
1122 (1980); *Billingsley v. Comm'rs of Marshall Co.*, 5 Kan. App.
435, 435-36, 49 P. 329 (1897). Moreover, the rule was already a
familiar one in Kansas before *Holy Trinity Church*: Justice Brewer
had used virtually the identical language in an opinion for this court
in the *Prohibitory-Amendment Cases*, 24 Kan. 700, 716 (1881) (cit-
ing to Lord Coke).

More recently, a native Kansan, the late Professor Philip Frickey,
revitalized the scholarly field of statutory interpretation, working
with his longtime colleague, Professor William Eskridge. They have
argued—convincingly, in my view—that the hardest cases in stat-
utory interpretation are best resolved by considering all of the
sources of meaning traditionally considered. See Eskridge &
Frickey, *Statutory Interpretation as Practical Reasoning*, 42 Stan.
L. Rev. 321 (1990). Frickey and Eskridge rightly acknowledge that
text is clearly the most important component in determining stat-
utory meaning—a point that had concededly been missed by some
courts in the decades between *Holy Trinity Church* and the re-
surgence of scholarship in this field that Frickey and Eskridge led
beginning in the 1980s. But one need not throw out all other clues
to legislative intent merely to restore text to its proper position of
primacy.

After all, as this court has long recognized, we are trying to de-
termine what the legislature intended the statute to do. See, *e.g.,
Jones v. Kansas State University*, 279 Kan. 128, 145, 106 P.3d 10
(2005) ("The fundamental rule of statutory construction is that the
intent of the legislature governs if that intent can be ascertained.");
*State v. Bancroft*, 22 Kan. 170, 204-05 (1879) (Brewer, J.) ("The
cardinal canon of construction is that the [legislature's] intent,
when ascertained, governs; so that all mere rules of interpretation
are subordinate."). Thus, we have not strictly enforced the plain
meaning of a statute when it was contrary to the statute's purpose
and the legislature's intent. See, *e.g., School District v. Board of
County Commissioners*, 201 Kan. 434, 439, 441 P.2d 875 (1968)
(when literal interpretation "would contravene the manifest pur-
pose of the legislature" a statute must instead be interpreted ac-

cording to its purpose); *Motor Equipment Co. v. Winters*, 146 Kan. 127, 131, 69 P.2d 23 (1937) (a court is not obligated to interpret a statute literally "when in our judgment such construction is not in harmony with the intent of the lawmakers").

It is beyond the scope of a judicial opinion to engage in a full review of the scholarship supportive of a broader view of statutory interpretation than the court's summary statement—that it won't consider anything but the text when it initially seems clear—implies. But I will provide a sketch of the argument in the hope that it may help to focus future consideration of this important issue within the bar and this court, as well as by the public we serve.

In broad brush, Professors Frickey and Eskridge argue for several reasons that a strict textual approach ultimately leads to unpredictable results (which undermine respect for the rule of law). First, meaning is rarely as clear as we might suppose. A statute prohibiting discrimination on the basis of race may have been intended to prohibit malicious discrimination based on hatred—but the word "discriminate" can also connote a simple differentiation (as in a preference for pears over peaches). Determining whether Congress intended in the 1964 Civil Rights Act to prohibit affirmative-action programs when it banned racial discrimination in hiring may depend upon one's understanding of what discrimination is. Second, meaning may vary based upon objective context: Is an affirmative-action program to counter racial disparities in the workplace equally in violation of a statute prohibiting racial discrimination as would be the refusal to hire minority races at all? Third, meaning may vary based upon the interpreter's own context, including current values. Certainly an understanding of the meaning of discrimination would have differed among different races in 1964—and an understanding of that meaning might also have been different in 1974 when racial disparities had not been overcome in the workplace. By 1984 or 2004, an understanding of the meaning of discrimination might again differ from what it had been in 1964 given other developments both in the workplace and in the law. Similarly, whether an organization that openly discriminates on the basis of race qualifies as a charitable organization—so that contributions to it are tax-deductible—might look quite different in 2011

than it did in 1930 even without a change in the tax statutes. See 42 Stan. L. Rev. at 340-45.

Professors Frickey and Eskridge urge courts to consider a hierarchy of sources, giving the most weight to text but also considering legislative-history materials, legislative purpose, evolution of the statutory scheme (*e.g.*, have later changes in the statute added to its purposes in a way that might broaden or narrow the meaning of one of its unamended sections?), and current policy (*e.g.*, has the country's broad policy enacted in various statutes against racial discrimination changed the accepted—or acceptable—understandings of a statute passed in an earlier time?). See 42 Stan. L. Rev. at 345-62. As Professor Eskridge notes, all of these factors except legislative-history materials "have been staples of American statutory interpretation since the founding era." Eskridge, *No Frills Textualism*, 119 Harv. L. Rev. 2041, 2042, 2054 (2006). And legislative-history materials have been routinely considered at least since 1892, when Justice Brewer's opinion in *Holy Trinity Church* became the first United States Supreme Court case to cite such materials.

To be sure, the Frickey and Eskridge approach is an updating of mainstream statutory-interpretation methods. But the principle recognized by Justice Brewer in *Holy Trinity Church* has long been recognized in Kansas and elsewhere, as has the willingness to use all sources of information, including legislative history, when interpreting statutes. The Kansas opinions cited throughout this concurring opinion demonstrate that Kansas has long been well within this mainstream consensus.

Fairly understood, the pragmatic approach of Frickey and Eskridge is also a textual one: analysis begins with the text, and text is considered the strongest factor. So when the text is clear, it will trump other factors. But when several other factors suggest a different meaning, the court may discover—by considering these other factors—that the text's meaning is not really as plain as it first appeared. When legislative history, statutory purpose, and current public-policy norms (such as those found in other statutes or in constitutional provisions) strongly suggest a result contrary to the plain meaning, the Frickey-Eskridge method suggests that the

apparent plain meaning may not be the final outcome. And Kansas caselaw has been consistent with that approach. As this court has said, "In determining legislative intent, courts are not limited to a mere consideration of the language used, but look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished and the effect the statute may have under the various constructions suggested." *State ex rel. Ludwick v. Board of Johnson County Comm'rs*, 233 Kan. 79, 84, 661 P.2d 377 (1983). And after considering all of these sources, "the purpose and intent of the legislature governs . . . , even though words, phrases or clauses at some place in the statute must be omitted or inserted." 233 Kan. at 84.

I recognize that reasonable people may disagree about statutory-interpretation methodology. But I am concerned that if the words this court now uses mean what they say—for example, that we will consider canons of construction only if we first find the text unclear—then Kansas will be applying a super-strict textualism that is both contrary to the practices used by our courts since the state was founded and unwise.

Even textualist judges will normally consider canons based on linguistic understandings when determining whether the text is clear. See Eskridge, 119 Harv. L. Rev. at 2042-43; *Chisom v. Roemer*, 501 U.S. 380, 404, 111 S. Ct. 2354, 115 L. Ed. 2d 348 (1991) (Scalia, J., dissenting). If *no* canons may be considered, then even linguistic canons like the punctuation rule (placement of punctuation is presumed to have meaning), the last-antecedent rule (referential words usually apply only to the last antecedent), the *expressio unius* maxim (the expression of one thing suggests the exclusion of others), and the presumption of meaningful variation (different wording suggests different meaning) would be out of bounds. But these rules simply reflect common understandings about how our language is used and often provide useful clues to intended meaning.

More important, the super-strict textualism suggested by the court's language leaves no room for the correction of absurd results or scrivener's errors (the unintended mistakes most writers make while hoping a proofreader will catch them). If nothing but the

text may be consulted—and the text seems to have a plain meaning—how would such an error be identified?

Yet some results simply are too absurd to be considered the product of rational legislators.

Consider this example from Judge Richard Posner. Assume that the legislature makes the knowing possession of child pornography a crime and that all the State must prove is that the defendant knew he or she possessed such materials. See 18 U.S.C. § 2252A(a)(5)(B) (2000); Posner, How Judges Think 214-15 (2008). During the prosecution of such a crime, the evidence (which is the child pornography) may be possessed by law-enforcement personnel, prosecutors, defense attorneys, judges, jurors, and other court personnel. Each will have knowingly possessed child pornography, and that's all the statute requires. But it would be absurd to conclude that any of them have violated this statute.

In one state, Wyoming, the legislature included an explicit exception in its statute forbidding possession of child pornography for peace officers, court personnel, and district attorneys "engaged in the lawful performance of their official duties." Wyo. Stat. § 6-4-303(b)(iv)(A) (2009). Thus, we know that a legislature *could* foresee this potentially absurd result and craft its statute to avoid it. But if the legislature doesn't include such an exception, must the courts be powerless to provide one?

Kansas courts have previously done so. For example, in *Cardarella*, 228 Kan. at 705, the court considered a municipal ordinance that restricted the commercial sale or display of items identified with drug usage in areas accessible to minors. The ordinance applied to "simulated controlled substances," which were defined to include "any products which identify themselves by using a common name or slang term associated with a controlled substance." 228 Kan. at 700. A defendant argued that the ordinance was so overbroad that it would apply to the soft drink called "Coke." 228 Kan. at 705. But the court rejected that argument, citing *Holy Trinity Church* and concluding that the ordinance shouldn't be read to apply to products not identified with drug-related activities. As Chief Justice Nuss has noted, "[T]he Kansas Supreme Court has applied the 'absurd result' rule for many years." *State v. Kirk-*

*patrick*, 286 Kan. 329, 359, 184 P.3d 247 (2008) (Nuss, J., dissenting) (citing cases); see also *State v. Walker*, 280 Kan. 513, Syl. ¶¶ 5-6, 124 P.3d 39 (2005) (applying absurd-results rule); *Miller v. Kansas Dept. of SRS*, 275 Kan. 349, 362, 64 P.3d 395 (2003) (plain-meaning rule is a rule of thumb based on experience, not a rule of law that precludes consideration of persuasive contrary evidence); *Commerce Trust Co. v. Paulen*, 126 Kan. 777, 780, 271 P. 388 (1928) (courts may depart from literal construction of statutes to avoid absurd results).

Consider another of the classic absurd-results cases, *United States v. Kirby*, 74 U.S. (7 Wall) 482, 19 L. Ed. 278 (1868). Kirby, a local sheriff, received a warrant to arrest a man named Farris for murder. But Farris was a mail carrier, and Congress had made it a federal crime to knowingly obstruct or delay a mail carrier. Kirby arrested Farris while he was delivering mail, and Kirby was charged with the federal offense of obstructing the mail. A unanimous Supreme Court held that "[t]he reason of the law . . . should prevail over its letter" so as to avoid "an absurd consequence" that Congress surely did not intend. 74 U.S. at 486-87. The Court relied upon two European precedents to support the absurd-results exception to plain meaning: (1) that a medieval surgeon who opened the vein of a person who fell down on the street in a fit would not be held to violate an Italian law against street violence that said that "whoever drew blood in the streets should be punished with the utmost severity"; and (2) that a prisoner who broke out of prison during a fire could not be punished for the escape because common sense says that the prisoner may not "be hanged because he would not stay to be burnt." 74 U.S. at 487 (quoting Edmund Plowden, who reported English cases during Elizabethan times, in the second example).

Examples like these are typical of ones in which questions of statutory interpretation often arise. The legislature has passed a statute designed to deal with a particular problem, and it has fashioned the language to fit the typical sorts of cases it had in mind. But the language could easily apply in other, less typical, situations, and it's not clear—the "plain language" of the statute notwithstanding—whether the legislature really intended for it to apply in these

unanticipated situations. In such cases, courts wisely look to all available sources to try to confirm whether the legislature really meant the statute to apply to the unanticipated situation. See Solan, The Language of Statutes 48-49, 80, 222, 226 (2010).

Perhaps I read too much into this court's language in recent cases rather than its holdings. In *State v. Trautloff*, 289 Kan. 793, 217 P.3d 15 (2009), for example, even though the court recited the rule that it won't go beyond plain language, the court found a scrivener's error and examined legislative-history materials. But there was not only an arguable ambiguity in the statute but also a statutory fix that had taken place before the decision in *Trautloff* (but after the underlying conviction in the *Trautloff* case). In addition, even when citing its recent only-look-at-the-plain-language rule, the court has sometimes considered legislative-history materials even after finding a statute unambiguous. See *Phillips v. St. Paul Fire & Marine Ins. Co.*, 289 Kan. 521, 526-27, 213 P.3d 1066 (2009).

One of the stated rationales for strict textualism is that it will encourage the legislative branch to do a better job in drafting statutes. But there are at least four problems with this proposition.

First, the legislative process is inherently incapable of perfection. Bills usually pass through committees in two chambers, then are heard on the floor of each chamber, and often are reconciled in a conference committee. Whether or not the legislative process is like making sausage, it's not tidy.

Second, legislators simply can't anticipate all of the potential situations in which a statute may be applied, especially as times change. Judge Posner has noted the realistically impossible burden super-strict textualism places on legislators:

"Strict construction, along with its textualist-originalist variants, would place an unbearable information load on our legislatures. It would require them to be able to anticipate not only every quirky case that might arise to exploit ambiguities in statutory language but also every future change in society (such as the advent of the telephone or the Internet) that might make a state or constitutional provision drafted without awareness of the change fail to achieve the provision's aim." Posner, How Judges Think 198.

Third, there is no evidence legislatures can or will respond as envisioned. Even if it were possible for the legislative process to

respond to court challenges to write better, clearer statutes, there is no empirical evidence that any legislature has improved its performance in response to a court practicing strict textualism. Moreover, coming up with a sufficient legislative coalition to pass a bill fixing a language error is much different than coming up with one to pass a substantive bill in the first place.

Fourth, the vast majority of statutes now on the books were passed while the Kansas Supreme Court was applying a consistent approach under which it examined all clues for a statute's meaning and explicitly trimmed back statutes when literal application clearly exceeded the legislature's desired ends. To the extent that the legislature *does* respond to our statutory-interpretation approach when it drafts and passes statutes, adopting a dramatically different interpretative approach now and applying it to statutes already on the books runs contrary to long-encouraged legislative expectations. There can be little doubt that our legislature has expected a continuation of past practice in this area: K.S.A. 77-109, a statute in place since 1923, provides that "any general statute of this state . . . shall be liberally construed to promote [its] object."

So what happens when the court adheres only to an apparent plain meaning and refuses to use all the tools available to it to determine legislative intent? Unintended and inequitable results will surely occur. And even if the legislature does fix some or most of the errors found, those litigants whose cases are decided in the interim still will suffer unintended and inequitable results.

Indeed, under such an interpretive regime, the sheriff in *Kirby* would have been sent to federal prison for arresting a mail carrier on a murder warrant before the suspect had finished his mail route. Congress would surely have amended the statute, but since statutes operate prospectively, that would have saved only future sheriffs, not the one who had arrested Kirby. There would be many more cases in which our court says, as it did recently, that the result it has reached when applying a statute's plain meaning "may appear somewhat nonsensical." *Hill v. Kansas Dept. of Labor*, 292 Kan. 17, 23, 248 P.3d 1287, 1291 (2011).

We need not go this route. After all, until quite recently, this court has used all of the standard interpretive tools at its disposal,

something it had done for as long as our courts have existed: in the very first volume of our reported decisions, the court considered a statute's purpose to determine legislative intent and the statute's meaning, noting that legislative intent "is to be ascertained by all legitimate methods of interpretation." *Jones v. State of Kansas, ex rel. Atherby and Kingsbury*, 1 Kan. 273, 279 (1863). That same approach was advocated by the great Chief Justice of the United States, John Marshall: "Where the mind labors to discover the design of the legislature, it seizes every thing from which aid can be derived." *United States v. Fisher*, 6 U.S. 358, 386, 2 L. Ed. 304 (1805); *accord Patterson v. Eudora*, 190 U.S. 169, 173, 23 S. Ct. 821, 47 L. Ed. 1002 (1903) (Brewer, J.) (quoting *Fisher*); *Holy Trinity Church*, 143 U.S. at 462 (same).

One of the values of precedent is that we are able to rely upon the collective wisdom of those who have gone before us—judges who have literally considered thousands of cases over decades and, here, even centuries. Let us follow that collective wisdom and consider all potential clues to legislative intent and statutory meaning, all the while recognizing the primacy of the text.